[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 16, 2001
THOMAS K. KAHN
CLERK

————————————————

No. 00-15721

————————————————

D. C. Docket No. 96-01017-CV-S

DARRELL B. GRAYSON,

Petitioner-Appellant,

versus

LESLIE THOMPSON,

Respondent-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

**(July 16, 2001)**

Before ANDERSON, Chief Judge, BIRCH and HULL, Circuit Judges.

HULL, Circuit Judge:

Darrell Grayson appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus in his capital case. In June 1982, Darrell Grayson was convicted of the capital murder of an elderly widow and sentenced to death in the Circuit Court of Shelby County, Alabama. Pursuant to 28 U.S.C. § 2253, the district court

granted a Certificate of Appealability with respect to certain issues in Grayson's

§ 2254 petition. After review and oral argument, we affirm the denial of Grayson's

§ 2254 petition.

## I. BACKGROUND

The judge who sentenced Grayson to death found these facts regarding

Grayson's crime:

> Mrs. Annie Laura Orr was an eighty-six (86) year old widow who lived alone in her house in Montevallo, Alabama. At the time of her death, she stood about five feet three inches tall, and weighted [sic] some one-hundred seventeen pounds. Her granddaughter visited her during the day of December 23rd, 1980, and found her appearing to be in good health, ambulatory, and in possession of her mental faculties. Her personal physician, Dr. Lewis Kirkland, described her as being in good health for a woman of her age.

> During the evening hours of December 23rd, 1980, the Defendant Darrell Grayson, Co-defendant Victor Kennedy, and two other individuals, met at Kennedy's residence, also in Montevallo, and a short distance from that of Mrs. Orr. They drank wine and played cards. Sometime shortly after midnight, and after the other individuals had gone, Kennedy and Grayson left Kennedy's house on foot, walking in the direction of Mrs. Orr's house. They were armed with a .38 Caliber handgun, which belonged to Kennedy. They decided to burglarize Mrs. Orr's residence in order to get some money. They had previously discussed such a burglary, that Mrs. Orr was elderly, and where she kept her money.

> They entered the Orr house during the very early morning hours of December 24th, 1980, through a rear basement door. They then proceeded through the dirt basement, up several steps, and into the main living portion of the house near Mrs. Orr's bedroom. The Defendants used a flashlight to illuminate their way.

2

Once inside the living portion of the house they entered Mrs. Orr's bedroom where she was apparently sleeping. They subdued and beat her, striking her in the head with a blunt instrument and breaking several of her ribs. Darrell Grayson then placed a pillowcase over her head and wrapped two relatively long lengths of masking tape very tightly around her head so that when they were finished he[r] head then appeared to be that of a mummy. They then proceeded to look for money and other valuables.

When apparently they could not find a significant amount of cash, the[y] began threatening Mrs. Orr by beating her further, threatening to drown her, and firing two shots from Kennedy's pistol, into her bedroom block and wall. Also during their assault, they raped Mrs. Orr repeatedly. Darrell Grayson said he didn't want to rape Mrs. Orr but that he did so twice. Mrs. Orr lived through the assault of being raped, beaten, threatened, unable to see or adequately breathe, and begging her assailants not to hurt her but to take the money and leave, for a considerable period of time. She then died.

(Vol. V, Order on Imposition of Death Penalty, pp. 0195-197).

## A.    Grayson's Arrest

Around nine a.m. on December 24, 1980, Dr. Milton Orr discovered the dead body of his 86-year-old mother, Mrs. Annie Laura Orr, in the bedroom of her home in the small community of Montevallo, Alabama.[1] He called law enforcement and a doctor. Law enforcement officers ("officers") discovered a trail of playing cards, that matched cards found inside Mrs. Orr's home, leading away

---

[1] Grayson's trial counsel emphasized to the trial judge in the case the closeness of the small Montevallo community and the "longstanding relationship" that the entire Orr family had with the Montevallo community. (Vol. I, R-238). Indeed, the newspaper serving the entire county in which Montevallo was located had a circulation of only 8,850 people in December 1980. (Vol. I, R-157).

from the crime scene in the direction of the home of Victor Kennedy, a known burglar. Captain Reed Smith, one of the officers investigating the crime, had worked on a burglary involving Kennedy approximately six weeks earlier that "went along the same route." (Vol. XIII, p. 0171). Another officer had arrested Kennedy fifteen or sixteen times prior to Mrs. Orr's murder and was familiar generally with the Grayson family. Officers knew that Kennedy and Grayson were friends and had been seen together the previous night. Officers were aware that Grayson had worked for Mrs. Orr previously and that he was familiar with her residence. (Vol. XIII, pp. 0171-73). Therefore, in the early afternoon of December 24, officers began looking for Grayson. Officers found him near his home "squatting in the bushes" in a wooded area and took him into custody. Following his arrest, Grayson confessed. In addition, officers recovered Mrs. Orr's wedding rings from Grayson's wallet and obtained physical evidence from Grayson linking him to the crime.

## B.     Grayson's Confessions

After Grayson was taken into custody on the afternoon of December 24, Grayson gave a series of statements. Before each statement, the officers informed Grayson of his Miranda rights. When Grayson was first taken into custody, Sergeant John Pratt advised Grayson of his Miranda rights and told Grayson that

4

he would sit down and talk with him at police headquarters regarding the death of Mrs. Orr the previous evening. Pratt informed Grayson that he should think carefully about the previous evening in order to participate in that conversation. In what has been characterized as his first statement, Grayson responded by stating something like "Yes sir, I understand what you are talking about." (Vol. I, R- 51).

Approximately one hour after Grayson was transported to the police department, Pratt and Chief Troy Kirkland questioned him regarding the death of Mrs. Orr after advising him of his Miranda rights a second time and obtaining his signature on a Notification of Rights form.[2] (Vol. I, R-19; 54). During that

---

[2] The Notification of Rights forms signed by Grayson read as follows:

Before asking you any questions, it is the law that you must be advised of your following Constitutional rights:

1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
5. If you wish to answer questions now without a lawyer present you still have the right to stop answering at any time.

_____
Deputy Sheriff

I have read the above and understand fully each of these rights. Having these rights in mind I wish to make a voluntary statement and answer any questions without contacting an attorney or having one present. No force, threats, or promises have been used by anyone in any way to make me sign this, and I sign this statement after having been orally advised of my Constitutional rights set out

5

interview, Grayson told the officers that he had performed yard work for Mrs. Orr in the past, was familiar with her house, and had entered her home with Victor Kennedy in the early morning hours of December 24. He admitted that they had awakened Mrs. Orr and had repeatedly raped her in the course of searching the house for valuables. After taking what money and valuables they could find, Grayson and Kennedy left Mrs. Orr on her bed and left the house.

Within thirty minutes of this interview, Grayson orally waived his Miranda rights a third time. The officers then conducted another interview and tape recorded Grayson's story about the rape and burglary. Grayson repeated the account of the crime previously given to officers. Although he admitted that he had known where to look for money in Mrs. Orr's house as a result of doing work for her in the past, Grayson claimed that both the burglary and rape were Kennedy's ideas. Grayson explained that he and Kennedy had consumed several gallons of wine the preceding evening.

Two days later, on the afternoon of December 26, Grayson gave another recorded statement to Captain Reed Smith. After again signing a Notification of Rights form waiving his Miranda rights and expressing his willingness to speak

---

above, and understanding them in full.

SIGNATURE_____ DATE _____ TIME _____

6

with the police without a lawyer, Grayson gave another account of the crime. Grayson explained that he and Kennedy had been planning for a couple of weeks to rob Mrs. Orr to get money for Christmas. Grayson said that Mrs. Orr was selected as a target because he had worked for her and was familiar with her house and where she kept money.

Grayson stated that Mrs. Orr had begged them not to hurt her and told them to take her money. Grayson explained that he had taped a pillowcase over Mrs. Orr's face to prevent her from recognizing him, although he stated that he did not think Mrs. Orr would recognize him since it had been years since he had worked for her. After he taped the pillow case over her head, Grayson could not understand what she was saying and that her words sounded like mumbling. He described both Kennedy and himself raping Mrs. Orr repeatedly and their unsuccessful search for money and other valuables. He admitted that he had taken Mrs. Orr from her bedroom into the bathroom at one point during the crime and had returned with her to the bedroom and raped her again. He stated that he could not remember why he took her to the bathroom or what transpired there. Grayson stated that Kennedy urged him repeatedly to leave the house while he was raping Mrs. Orr and that he left Mrs. Orr on her bed with the pillowcase taped over her head and face and exited the house. (Vol. V, PP. 0160-0180).

7

**C.    Grayson's Motion to Suppress Confessions**

Attorney Richard Bell was appointed to defend Grayson, who entered a plea of not guilty and not guilty by reason of insanity.  Prior to trial, Bell moved to suppress Grayson's confessions.  Bell argued that they were given without a knowing and intelligent waiver of his right to counsel because Grayson: (1) was "extremely intoxicated and unable to comprehend or understand the implications raised by the admissions" at the time; (2) was "a person with an extremely limited education who could not possibly be expected to understand the implications raised by the admissions"; and (3) made the statements "as the result of promises of probation, lighter sentence, or benefit . . . by the fact of his admitting certain facts." (Vol. V, pp.00059-00061).

The trial court held an evidentiary hearing on the motion to suppress. Sergeant Pratt testified that he administered full <u>Miranda</u> warnings to Grayson prior to all four interviews, in which he specifically advised Grayson: (1) that he had the right to remain silent; (2) that anything he said could and would be used against him in a court of law; (3) that he had a right to talk to an attorney and have an attorney present while he was being questioned; (4) that a lawyer would be appointed to represent him before any questioning if he could not afford one; and (5) that he had the right to stop answering questions at any time if he wished to

have a lawyer present. (Vol. I, pp. 18, 49, 53). Pratt testified that no officer had made any promises, threats, or inducements of any kind to Grayson. Grayson told Pratt that he understood his rights and wished to waive them and talk to the police. Pratt explained that Grayson had manifested his understanding of his rights and his desire to speak to police without a lawyer by signing a <u>Miranda</u> waiver form on December 24 prior to giving his statements.

With respect to Grayson's demeanor during the interviews, Pratt testified that he did not smell alcohol on Grayson or see any other indications of alcohol or drug use. Grayson was not slurring his speech. The only time that Pratt experienced difficulty understanding Grayson was when Grayson lowered his head and talked "straight to the floor." Pratt testified that there were no alcohol or drug tests performed on Grayson on the date of his arrest despite Grayson's statements that he had consumed gallons of wine the night before. Pratt described Grayson's general demeanor as "normal," although he admitted that Grayson appeared nervous a few times and became fidgety.

Captain Smith also testified about Grayson's statement on December 26. Prior to that interview, Grayson had been fully advised of his <u>Miranda</u> rights and had manifested his desire to talk to the police without a lawyer present. Like Pratt, Smith testified that no threats, promises or inducements of any kind were made to

9

Grayson and that Grayson never indicated that he wanted to talk to family members or anyone else. Counsel for the State also introduced the transcripts of the third and fourth tape recorded interviews into evidence at the suppression hearing.

The trial court found that Grayson gave his statements after knowingly and voluntarily waiving his constitutional rights. At trial, the court again ruled the statements voluntary and admissible and admitted them during the State's case-in-chief.[3] During the past twenty years, Grayson has never recanted his confessions.

## D. Motion for Funds to Hire Expert Witnesses

Prior to trial, Bell also filed a motion for funds to hire expert witnesses.[4] Specifically, counsel claimed that expert assistance was necessary to refute and cross-examine the findings of the State's (a) forensic pathologist who performed the Orr autopsy and (b) serology expert who examined blood and sperm samples taken from the crime scene. The trial court granted the motion, allowing up to Alabama's $500 statutory limit for expert funds.

## E. Bryce Hospital Evaluation

---

[3] Although the trial court had informed the State at the suppression hearing that it would be required to admit the actual tape recordings into evidence at trial, only the transcripts were admitted with no objection from Grayson.

[4] We note that Grayson's counsel filed numerous other pretrial motions not addressed herein because they are not relevant to the issues on appeal.

On a defense motion for an evaluation, the trial court ordered that the supervisor of Bryce Hospital, an Alabama state hospital, be appointed to examine Grayson to determine: (1) his sanity; (2) his ability to consult with his attorney with a reasonable degree of rational understanding; (3) his understanding of the nature of the charges against him; (4) whether he was suffering from a mental disease or defect at the time of the crime; and (5) whether he lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Vol. V, pp. 00154-00155). The examination generated reports and observations from the Bryce Hospital staff which the court released to the State and Grayson. These reports concluded that Grayson had average intelligence with a full-scale IQ score of 92, and that his criminal activity was "not viewed as being the product of a mental disease, defect, or derangement." (Vol. V, pp. 00115; 00147). Although the reports concluded that Grayson was an alcoholic with dependent traits, they found no suggestion of organic impairment. Neither the State nor the defense introduced any evidence regarding the Bryce Hospital evaluation at trial.

**F.      The State's Evidence**

At trial, the officers described the crime scene and the physical evidence collected from Mrs. Orr's home and the surrounding areas, aided by numerous

11

photographs and other pieces of physical evidence. Officers testified about the trail of playing cards which matched cards found in Mrs. Orr's home and in Kennedy's bedroom. They recounted the circumstances leading to Grayson's arrest and the subsequent recovery of a bloody shirt belonging to Grayson in the woods near his home. The transcripts of Grayson's confessions were also admitted into evidence.

Although the State presented expert testimony regarding the crime scene, most of that evidence was inconclusive as to the identity of the perpetrator of the killing. The State's fingerprint expert testified about the lifting and analysis of latent fingerprints found both at Mrs. Orr's home and on evidence found close to the scene of the crime. The fingerprint expert explained that the latent fingerprints were insufficient to allow for fingerprint analysis.

The State's trace evidence expert testified regarding the comparison of hairs recovered from the crime scene with hairs taken from Grayson and Kennedy. The expert explained that several hairs recovered from the scene had "negroid" characteristics consistent with the head hair of both Kennedy and Grayson and inconsistent with the victim's hair. The expert clarified, however, that the hairs recovered from the scene were too small to allow for an individual comparison of them with hair samples taken from Grayson and Kennedy. Thus, the expert did not

12

attribute the hairs recovered from the scene to either Grayson or Kennedy specifically. The trace evidence expert also testified about a hair recovered from Grayson's sock following his arrest. He explained that the hair was inconsistent with Grayson's hair and consistent with the victim's head hair. Although the hair was consistent with Mrs. Orr's, the expert could not opine that the hair was hers.

The State's ballistics expert testified regarding two bullets found at the crime scene. One was wedged into the wall separating the victim's bedroom from her bathroom and one was recovered from the floor in her bedroom. The ballistics expert opined that both bullets were of the .38 caliber size and were fired from the same weapon, likely a .38 or .357 Smith and Wesson revolver. The ballistics expert also testified concerning the pieces of the shattered clock recovered from the crime scene and opined that the hole that penetrated the clock was consistent with a .38 bullet fired at a slight angle.

The State's serology expert also testified and explained that bloodstains found on a pillowcase and a bed spread in Mrs. Orr's bedroom could not be typed. Urine and semen stains found on a bed sheet recovered from Mrs. Orr's bathroom also could not be typed. The expert testified that he was able to type the bloodstains on Grayson's shirt recovered from the woods near his house and that the type O bloodstain could not have come from Grayson, whose blood type was

type B.  The expert testified that the type O bloodstain could have come from either Kennedy or Mrs. Orr, both of whom had type O blood.   Finally, the serology expert testified that a large blood and semen stain on Mrs. Orr's nightgown was type B, which was consistent with Grayson's blood type and inconsistent with Kennedy's.

The State also called the autopsy doctor, who testified that Mrs. Orr had died of asphyxiation as a result of the pillow case taped tightly over her face and that her injuries were consistent with a sexual assault.  The doctor  described the many injuries on Mrs. Orr's body with the aid of numerous photographs.  He testified that Mrs. Orr was severely bruised on her chest, arms, legs, and genital area as a result of blunt force.  She also had a laceration on her forehead and five broken ribs.

## G.    Defense at Trial

In his opening statement, defense counsel Bell asked that the jury consider the case rationally and not be unduly swayed by the emotional nature of the case. Counsel promised the jury that the defense would not lie to them throughout the case.  During the bulk of the State's evidence regarding the crime scene and the evidence collected at Mrs. Orr's house, defense counsel conducted little cross-

examination. Most of that evidence did not implicate any specific individual in the killing.

Defense counsel fully cross-examined the autopsy doctor. In response to the litany of injuries described by the doctor, defense counsel inquired whether those injuries contributed to Mrs. Orr's death or were in any way "life-endangering injuries." The doctor conceded that Mrs. Orr's injuries had not contributed to the death by asphyxiation and were not individually life threatening.

In addition, defense counsel questioned the doctor about the pillow case taped around Mrs. Orr's head. The doctor admitted that Mrs. Orr was able to receive some air through the pillow case and that Mrs. Orr's bodily fluids may have filled the pores of the pillow case fabric and caused the air flow to be diminished over time. Further, in response to defense counsel's questioning, the doctor admitted that there was no physical evidence that Mrs. Orr's hands had been bound at any time to prevent her from removing the pillowcase. Defense counsel emphasized on cross-examination that the autopsy doctor had been able to remove the pillowcase over the top of Mrs. Orr's head without loosening or cutting the masking tape that held it. Finally, defense counsel explored with the doctor a possible connection between Mrs. Orr's arteriosclerotic disease and her death by suffocation.

15

Defense counsel also cross-examined the State's ballistics expert and asked him whether the police had given him a gun that matched up with the bullets recovered from the scene. The expert responded in the negative. On cross-examination of the State's serology expert with respect to the type B semen stain on Mrs. Orr's nightgown, defense counsel focused on the fact that Grayson was a "non-secretor" who ordinarily would not secrete his blood type into bodily fluids in detectable amounts. Counsel further noted that the semen tested on the nightgown was mixed evenly with blood which could have produced the type B reading. Counsel also continued to object to the admission of Grayson's confessions on the basis of voluntariness throughout the trial.

Defense counsel called four witnesses: (1) Grayson; (2) Grayson's mother; (3) Grayson's sister; and (4) Sheriff Glasgow. Defense counsel walked Grayson through the events of the day and evening preceding Mrs. Orr's death. Counsel asked Grayson about the amount of alcohol he purchased and consumed and emphasized Grayson's repeated trips to buy alcohol and his consumption of large amounts of wine right out of the bottle for several hours immediately preceding the crime. Counsel established that Grayson and Kennedy had shared three 1/5ths of wine, one gallon of wine, and a half-case of beer between one or two p.m. and approximately midnight when they left to rob Mrs. Orr. Grayson testified that

16

Kennedy needed money, suggested that they rob somebody, and had "spotted" the Orr house.

In walking through the crime itself, Grayson repeatedly explained that he had shared in gallons of alcohol that night and could not independently recall many of the specific events that transpired. Grayson testified that he could not recall how he and Kennedy had entered Mrs. Orr's home. He could not recall beating or hitting Mrs. Orr or taking her into the bathroom. Grayson also did not recall taking Mrs. Orr's wedding rings from her home or placing them in his wallet. He had no recollection of the rings when Sheriff Glasgow located them in Grayson's wallet the next day.

Grayson admitted raping Mrs. Orr, but explained that he was reluctant to do so and committed that act only at Kennedy's urging. He admitted hearing something that sounded like a "muffled" gun shot, but testified that he did not know whether any shots actually had been fired. Grayson left the house at Kennedy's urging while Grayson was still searching for valuables. Counsel specifically asked Grayson why he had taped a pillowcase over Mrs. Orr's head and face and Grayson testified that he did this to keep from being identified. Grayson testified that Mrs. Orr was breathing and alive when they left the house because he heard her "making moaning noises like she was trying to say

17

something." Finally, counsel directly asked Grayson if he had gone to Mrs. Orr's house to murder her, to which Grayson responded, "No sir." Grayson testified that he completely forgot committing the crime the next morning until his mother told him of Mrs. Orr's killing. He explained that he hid the bloodstained shirt he had been wearing the night before in the woods after recalling his involvement in the crime.

When probed on cross-examination, Grayson testified that he had been drinking heavily and that he doesn't remember when he drinks. Although admitting that he was sufficiently in possession of his faculties to walk, talk, and have sexual intercourse, Grayson continued to insist that he committed the crime due to the alcohol he had consumed. He explained that he "was very bad with alcohol" and that it was not uncommon for him to drink. Grayson admitted that he knew at the time that it was wrong for him to be in Mrs. Orr's house, however. Grayson further testified that he had told officers things in his statements that he really didn't remember based upon their suggestions of what Kennedy had said about the events that transpired. Grayson denied knowing that Kennedy was carrying a gun on the night of the killing until Kennedy pulled the gun out in Mrs. Orr's house.

Grayson admitted that he and Kennedy had been planning a robbery for at least a week and that Mrs. Orr's house was chosen because Grayson had worked for her and knew her house and where she had kept money. He admitted that he had raped Mrs. Orr at least once. Grayson also admitted that he had wrapped the pillowcase and tape around Mrs. Orr's head despite the fact that he had not worked for her in two years and did not believe she would be able to recognize him. He conceded that he had been the last one in Mrs. Orr's room and that he had not loosened the pillowcase before leaving the house. Grayson also admitted that Mrs. Orr had never done him any harm and specifically stated that "[s]he was very nice to me."

Defense counsel next called Grayson's mother, who testified that she had informed all of her children, including Grayson, of Mrs. Orr's death after receiving a phone call telling her of the crime. Grayson's sister testified that she was present when her mother shared the news and that Grayson made some remark like "how could anybody do something like that to an old woman." Sheriff Glasgow confirmed that Grayson had expressed surprise when Glasgow removed Mrs. Orr's wedding rings from Grayson's wallet and that Grayson had stated that he had never seen them before. The defense then rested.

## H.    Closing Arguments

The State's closing argument urged the jury to return a verdict of capital murder, contending that the evidence showed that Grayson intentionally killed Mrs. Orr during the course of the rape and robbery. They argued that Grayson was sober enough to walk, talk, rape, pillage the house for valuables, and walk home of his own accord. Thus, his intoxication was no defense. The State challenged Grayson's claims that he only wrapped the pillowcase around Mrs. Orr's head to prevent her from identifying him. If he had truly wanted to prevent identification, he could have covered his own head or simply her eyes and not tightly bound her head with a pillowcase and masking tape like a mummy. According to the State, it was obvious that no one could breathe with a head cover like the one used by Grayson. Thus, the State claimed the evidence showed Grayson's intent to kill Mrs. Orr.

Under Alabama law, the State had to convict Grayson of capital murder to obtain a death sentence. Capital murder required an "intentional" killing, whereas the lesser included offense of felony murder did not. Because Grayson had confessed to his involvement in Mrs. Orr's death, defense counsel focused in closing argument on Grayson's lack of intent to kill Mrs. Orr during the burglary, arguing that he was innocent of capital murder. Thus, at the inception of his closing, defense counsel conceded that Grayson fully expected a guilty verdict in

20

the case on some charge, but emphasized that the key question in the case was one of "intent." Defense counsel spoke at length about the evidence regarding Grayson's intent on the night of the killing. Defense counsel focused the jury on his cross-examination of the autopsy doctor and the medical evidence that suggested an unintentional killing. In arguing the lack of specific intent, defense counsel made references to Grayson's intoxicated state at the time of the crime and to his impoverished cultural background. Counsel also encouraged the jury to come back with a verdict of a lesser included offense. Defense counsel told the jury that Grayson was ashamed of what he had done and commended him for telling the truth from the start about his conduct and accepting whatever punishment resulted. Counsel also pointed out to the jury that Grayson had no prior record of violent crime and came from a family and cultural background that may have influenced his actions.

## I.    Jury Charges and Verdict

The trial court charged the jury with respect to the capital offenses charged in counts one and two of the indictment, as well as the lesser included offenses. In charging the jury with respect to the capital offenses, the court specifically instructed the jury regarding the intent element of an intentional killing, as follows:

> [T]here must also be an intentional killing. Now the intentional killing must be intended and I will define to you intentional as

follows. Intentional does not mean accidentally or inadvertently nor is a killing considered intentional because death occurs in a burglary. But it does mean that a person acted intentionally with respect to a result or to conduct described by the statute defining an offense when his purpose is to cause that result or engage in that conduct. The intent to kill must be independent of the act of committing the burglary itself but the two, the burglary and the intent to kill, must co-exist before this defendant could be convicted of the capital offense, as I have mentioned to you, and that is the highest offense included in this indictment.

(Vol. IV, R-1079). Shortly thereafter, the trial court again instructed the jury regarding an "intentional killing:"

The third element involves the defendant's intentional killing of Annie Laura Orr in that the State must prove beyond a reasonable doubt that the defendant personally shot, stabbed or otherwise killed the victim or that the defendant knowingly sanctioned and facilitated the killing done by another.

(Vol. IV, R-1080). Later in the jury instructions, the court again explained the general meaning of the term "intentionally," stating that: "[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his purpose is to cause that result or to engage in that conduct." (Vol. IV, R-1084). The trial court also charged the jury as to the lesser included offenses and explained the felony murder doctrine. The court instructed the jury that "when a homicide is committed in the course of or during an attempt to commit certain felonies which are inherently dangerous to life, the intent which must be shown to support a conviction for murder is supplied by the criminal intent

22

involved in the underlying felony." (Vol. IV, R-1086).   Thus, the court explained that the defendant did not have to intend the death of the victim in order to be guilty of felony murder.  Id.   The trial court strongly admonished the jury that the theory of intent underlying the felony murder doctrine could not be used to support a conviction of the capital offenses charged against Grayson:

> I charge you, ladies and gentlemen of the jury, that looking to the intent of the defendant on the capital felony crime as charged in Count One and Count Two of the indictment, you may not, and I emphasize the words **may not**, look to or consider the felony murder doctrine, though said doctrine could be applicable to lesser included charges as the Court will define them to you.

(Vol. IV, R-1086).

With respect to Grayson's intoxication, the court instructed the jury, as follows:

> Ladies and gentlemen of the jury.  I will charge you as to involuntary intoxication.  If you believe from the evidence that Darrell Grayson was involuntarily intoxicated and did not act – and did not as a result of being involuntarily intoxicated, lacked capacity either to appreciate the criminality of his alleged conduct or to conform his alleged conduct to the requirements of the law the defendant therefore could not form the necessary intent to commit the act.
>
> A person may become involuntarily intoxicated by the introduction into his body of substances such as alcohol or other drugs which impair or disturb his mental or physical capacities either, one, inadvertently as by accident or without knowing the nature or tendencies of the substance or, two as a result of being deceived or tricked into doing so by fraud, artifice or guile, or, three, as a result of being forced to do so himself or of it being forcibly introduced into his body without his consent.

23

A person may be deemed to know the nature or tendencies of a substance if, under the circumstances, he reasonably should have known such nature and tendencies.

**Intoxication of the defendant whether voluntary or involuntary may be considered by the jury if relevant to consider as negating an element of the offense charged, such as intent.**

However, being unaware of a risk because of voluntary intoxication is immaterial in a consideration of whether the defendant acted recklessly where recklessness is an element of the offense charges or a lesser included offense.

Intoxication does not in and of itself constitute a mental disease within the meaning of the 1975 Code of Alabama as defined in Section 13A-3-1.

Intoxication, other than involuntary intoxication, is not a defense to a criminal charge but may be considered by the jury, if relevant, on the question of whether the fact of intoxication negates an element of the offense charged such as intent, but not the element of recklessness.

(Vol. IV, R-1092-1093)(emphasis added). Finally, the court instructed the jury that it was free to disregard the defendant's confessions if it found them unworthy of belief. (Vol. IV, R-1101).

After approximately forty minutes of deliberation, the jury submitted several written questions to the court, one of which asked the court to define "intent." The court decided that the oral charge was sufficient and that the jury should be instructed to rely upon that charge in response to their questions. Defense counsel did not request a reinstruction on intent or object. Approximately one hour and ten minutes later, the jury returned a verdict finding Grayson guilty of capital murder.

**J.      Sentencing Phase at Trial**

24

At the sentencing phase, the State presented no additional evidence. The defense presented the testimony of Grayson and Grayson's mother. Grayson testified that he was only nineteen when he had committed the offense and that he had never committed a felony offense before, while his co-defendant, Kennedy, was a convicted felon. He told the jury that he had lived in Montevallo, Alabama his entire life and that he had completed the tenth grade in the public school system. He told the jury that he was one of eleven children and that most of his siblings worked to help support the family. Grayson's mother testified that Grayson had no prior felony record. It appears that defense counsel may have attempted to introduce evidence regarding Victor Kennedy's trial through the clerk of court but was prevented from doing so by the court's rulings.

In closing arguments, the State focused on the brutality of Grayson's crime, after explaining to the jury their responsibility to weigh the aggravating and mitigating circumstances in the case.[5] The State emphasized that Mrs. Orr's death was slow and agonizing and that she was horribly beaten and raped. The State claimed that these factors outweighed the defendant's age, record, and any remorse

---

[5] The transcript of the sentencing phase notes that counsel for the State and for the defense gave both opening and closing arguments to the sentencing jury, but the substance of those arguments was not part of that transcript. A transcript of the closing arguments from the sentencing phase apparently was prepared from audio tapes during the state post-conviction proceedings.

he might have.  The State suggested to the jury that the atrocious nature of the crime would outweigh any set of mitigating circumstances that a defendant could present.

In closing, defense counsel argued to the jury that a death sentence would cause continuing grief to the Orr family and fail to bring a resolution to the death of Mrs. Orr the way a life sentence without parole would.  Therefore, he argued that the jury should return a life sentence even though "[t]he evidence shows that this is a death by electrocution case."  He argued that Grayson could not be more greatly punished than to have to sit in a cell every day for the rest of his life.  In arguing to the jury the mitigating circumstances, counsel told the jury that Grayson respected Mrs. Orr despite his actions.  The focus of the closing, however, was on the best resolution for the Orr family.

The court instructed the jury with respect to the aggravating and mitigating circumstances to be considered in arriving at the proper punishment for Grayson's crime.  The judge instructed the jury with respect to the mitigating circumstances of age and of no history of criminal activity.  Although the court did not specifically discuss alcohol in its sentencing charge, the court instructed the jury at length on the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law as a mitigating circumstance.

After deliberating for approximately forty minutes, the jury determined that Grayson should be punished by death. (Order on Imposition of Death Penalty, Vol. V, p. 00194).

## K. Sentencing Hearing Before Trial Judge

Approximately three weeks later, the judge held a sentencing hearing to consider the aggravating and mitigating circumstances of Grayson's crime and to decide the sentence. Under Alabama law at the time, the jury's sentence was not dispositive. Instead, the court was required to sentence Grayson to death or to life without parole. See Horsley v. Alabama, 45 F.3d 1486, 1488 n.1 (11th Cir. 1995).

At the sentencing hearing, the State relied exclusively on the trial evidence. Defense counsel noted that he had "adequately stated to the Court the intent that he exhibited that night." Defense counsel also discussed the inadequacy of the funds allotted by the State of Alabama to provide for Grayson's defense in his capital case. Counsel further argued lack of intent to kill:

> And that we would submit to the Court that even though limited in our ability to prepare a defense financially for Darrell Grayson, that we have presented the fact that this man did not possess the intent, did not have the malice with which to be convicted of a capital crime, and should not be sentenced to death in the electric chair of the State of Alabama.

(Vol. IV, R-1151).

The trial court sentenced Grayson to death by electrocution and made both specific findings of fact and findings of aggravating and mitigating circumstances present in the case. As aggravating circumstances, the court found: (1) that the killing was committed while the defendant was engaged in the commission of a rape, robbery, and burglary and (2) that the killing was especially heinous, atrocious and cruel when compared to other capital felonies. With respect to the latter aggravating circumstance, the court stated:

> The Court finds that the actions of the Defendant were completely barbaric, showing a complete and utter disregard for not only human life, but human dignity. The Court cannot think of a case it has seen, heard, or even read, that would equal the cruelty shown in this case by the Defendant to Mrs. Orr. Indeed, the Court has some difficulty imagining what more the Defendants could have done to make this crime any more heinous, atrocious, or cruel.

(Order on Imposition of Death Penalty, Vol. V, pp. 00202-203).

The court also considered the mitigating circumstances, finding that Grayson had no long history of prior criminal involvement and that he was nineteen years old at the time of the offense. The court "also noted that the Defendant was relatively poor and unemployed, had abandoned his education in the tenth grade, although he did receive training at a technical school, had been raised without a father and had given his mother little trouble in growing up, at the time of the capital felony." (Order on Imposition of Death Penalty, Vol. V, pp. 00203-04).

28

The court specifically found that there was no compelling evidence that Grayson lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. "He clearly knew what he was going to do, what he was doing, and what he did, was wrong and illegal." (Order on Imposition of Death Penalty, Vol. V, p. 00204).

## L.     Direct Appeal and Post-Conviction Proceedings

Grayson's conviction and death sentence were upheld on direct appeal. Grayson v. State, 479 So. 2d 69 (Ala. Crim App. 1984); Ex Parte Grayson, 479 So. 2d 76 (Ala. 1985), cert. denied, Grayson v. Alabama, 474 U.S. 865 (1985). Grayson then filed a petition for writ of error coram nobis in the state court of Alabama on January 10, 1986. On September 24, 1990, Grayson filed an amended petition for relief from conviction and sentence of death, pursuant to Temporary Rule 20 of the Alabama Rules of Criminal Procedure. That petition was amended on August 23, 1991, January 28, 1992, and again on March 26, 1992.

On April 6 and 7, 1992, the Shelby County Circuit Court held an evidentiary hearing on the petition. Grayson presented the following evidence from expert and lay witnesses regarding his alcoholism and chaotic upbringing that he claimed could have been presented to the jury at his trial.

## M.     Experts at State Habeas Hearing

Dr. Cleveland's deposition testimony was introduced in Grayson's state habeas hearing. Dr. Cleveland has a Ph.D. in child and family development and compiled a family study and evaluated Grayson. (Vol. XIV, pp. 0356-357). Cleveland testified that Grayson's family was severely disturbed and that its members looked outside the family to have critical needs met. (Vol. XIV, p. 0365). There was food available in Grayson's house most of the time, but the family was very violent and chaotic. (Vol. XIV, p. 0365). There was little adult supervision over Grayson and his eleven siblings, and fighting and intoxication were the norm. (Vol. XIV, p. 0365). Alcohol was available in Grayson's home from the time that he was a small child, and alcohol abuse was rampant in the household. Numerous people came and went from Grayson's overcrowded home, and his teenage sisters had children who resided with them. (Vol. XIV, p. 0367). Dr. Cleveland explained the abusive and impoverished background of Grayson's mother and her inability to control or care for her children. (Vol. XIV, p. 0369-70). Grayson's mother used corporal punishment as the only real means of controlling her children. (Vol. XIV, p. 0375). Grayson had no positive male or female role models in his life.

As a result of this chaotic upbringing, Cleveland testified that Grayson was left without a way to solve problems or to cope with stresses of life and that he

30

began drinking heavily at an early age. (Vol. XIV, p. 0384). She explained that the alcohol consumption seemed to be "like a medication for him at times." Id. On cross-examination, Cleveland conceded that Grayson's upbringing is not all that uncommon in impoverished settings and that such an upbringing does not necessarily lead to murder. (Vol. XIV, pp. 0396-97). While it appears from Cleveland's family study and chronology that many of Grayson's eleven siblings had scrapes with law enforcement and that six of them spent time in jail, it appears that Grayson was the only one convicted of a violent crime. (Vol. XIV, pp. 0415-416; 0421-428).

Grayson also presented the testimony of Dr. Phillips, a forensic psychiatrist with expertise in chemical dependency and substance abuse. Phillips opined that Grayson was suffering from a personality disorder and from dependency as a result of severe alcohol and drug abuse at an extremely young age, causing an inability to function at a level expected of someone his age in areas like social skills, responsibility, daily living skills, personal independence and self sufficiency. (Vol. X, pp. 36-40; 44-46). Phillips testified that Grayson's excessive drinking included "periods of blackouts with some question of hallucination although they were extremely minimal and not terribly convincing in terms of my own diagnostic opinion." (Vol. X, p. 72). Phillips testified regarding alcoholic blackouts as

31

"amnestic episodes" that result in memory loss while a person is in the process of functioning. (Vol. X, p. 84). "And some of that anteriorgrade amnesia can have an onset in such a manner that as you are in a blackout you can't remember what you did the previous five minutes." (Vol. X, p. 84). Phillips testified that unintended consequences often result from intoxication and the impaired judgment that it causes. (Vol. X, p. 107). He also explained that Grayson's intoxication and other evidence at the crime scene suggested that Grayson did not appreciate the consequences of taping a pillow case over Mrs. Orr's head and the other actions he took that night. (Vol. X, pp. 109, 124).

Phillips opined that the absence of adult supervision and positive role models in Grayson's overcrowded home led to alcoholism in all but three of the twelve siblings. (Vol. X, p. 47). The chronic alcoholism of Grayson's mother led to chaos in the family, such as violence, disruption, arguing, hitting of children, and fights breaking out. (Vol. X, p.52). The absence of space and privacy in the small impoverished shack made up of scraps of wood where Grayson was raised was also critical in Grayson's development according to Phillips. (Vol. X, pp. 53-54). Phillips also opined that Grayson's lack of role models and validation at home led him to seek validation from the likes of Kennedy by conforming his behavior to the behavior patterns exhibited by Kennedy. (Vol. X, pp. 66-70).

32

Grayson was very perplexed at what he had done to Mrs. Orr and was ashamed of his role in the crime. (Vol. X, pp. 125-26). Phillips opined that this confusion and shame were consistent with his diagnosis of alcoholism and intoxication at the time of the crime. (Vol. X, p. 126). On cross-examination, Phillips conceded that Grayson's alleged adjustment disorder following the crime did not contribute to his commission of the crime against Mrs. Orr. (Vol. XI, pp. 169-70). Although Grayson had a history of antisocial behaviors, Phillips did not think he suffered from antisocial personality disorder. (Vol. XI, p. 172). Phillips testified that Grayson was not mentally retarded in his opinion, but was of average to low-average intelligence. (Vol. XI, pp. 192-93).

Dr. Burton, a licensed physician with a specialty in forensic medicine and pathology, opined that Mrs. Orr's death was the result of suffocation from a pillow case being taped over her head in such a way that it impaired her ability to breathe, although he conceded that it was possible that heart failure played some role. (Vol. XII, pp. 483-84). Burton testified that none of Mrs. Orr's wounds were of the type expected to cause death. (Vol. XII, p. 485). Based upon her death by suffocation, Dr. Burton testified that Mrs. Orr might have been alive when Grayson and Kennedy left her home and that it was possible for a person to live up to two hours in such circumstances. (Vol. XII, pp. 486-87). Because of Mrs. Orr's advanced

33

age, Burton testified that her bruising could have been caused with minimal trauma during a rape and restraint. (Vol. XII, p. 488). Dr. Burton also explained that the presence of bruises showed that Mrs. Orr was not unconscious during the attack, but awake and struggling, which would have led her attackers to believe that she was able to breathe. (Vol. XII, p. 491).

Dr. Burton further testified as to the effects of alcohol on an individual's ability to reason and understand the consequences of his actions. (Vol. XII, pp. 503-04). He opined that Grayson may have been capable of performing the mechanical tasks associated with covering Mrs. Orr's face and raping her, despite his intoxication, without comprehending the consequences of those mechanical acts. (Vol. XII, p. 504). Further, he explained that an intoxicated individual might have difficulty recalling an event shortly thereafter, but might regain memory of the event over time. (Vol. XII, p. 571).

Dr. McClaren was hired by the Alabama Attorney General's Office to conduct a psychological evaluation of Grayson. At the state habeas hearing, McClaren testified that he evaluated Grayson using the Wexler Adult Intelligence Scale-Revised and that Grayson received a verbal IQ score of 88, a performance IQ score of 80, and a full-scale IQ score of 83. He testified that these results suggest

34

average intellectual functioning.[6] (Vol. XI, p. 253). McClaren also administered the Minnesota Multiphasic Personality Inventory ("MMPI") to Grayson and testified that he did not find any evidence that Grayson was psychotic or had a major mental illness after evaluating his score on the MMPI, although Grayson did display a profile "frequently found among people who find themselves in conflict with societal realms." (Vol. XI, pp. 257-260). Further, McClaren opined that Grayson had some antisocial traits and suffered from some sort of unspecified personality disorder, although he could not be diagnosed with antisocial personality disorder. (Vol. XI, p. 262). McClaren diagnosed Grayson as being in remission from alcohol, and possibly cannabis, dependency. (Vol. XI, p. 261). McClaren opined that Grayson was able to appreciate the consequences of his actions on the night of the murder. (Vol. XI, p. 275).

The deposition testimony of Dr. Zimmerman, a psychologist with a specialty in mental health evaluations, was admitted into evidence at Grayson's state habeas hearing. Zimmerman diagnosed Grayson as alcohol dependent at the time of his

---

[6] McClaren testified that he met with Grayson on two occasions and reviewed numerous documents, including a trial transcript, Grayson's statements to officers following the crime, Grayson's Bryce Hospital records, Grayson's correctional records, his school records, a family study prepared by Dr. Cleveland, a psychological evaluation from 1974, and the deposition of Dr. Zimmerman. In addition, McClaren interviewed two of Grayson's sisters, his step-father, and two of Grayson's lifelong acquaintances. (Vol. XI, p. 241). Further, McClaren talked to officers involved in the investigation of Mrs. Orr's death. (Vol. XI, p. 242).

incarceration and opined that: "he would go through physical withdrawal from alcohol, alcohol affected the way he thought and his behavior, and what we know from animal studies is that alcohol probably affected his brain and those chemicals in the brain that carry messages from nerve cell to nerve cell." (Vol. XIII, p. 0257). Dr. Zimmerman also testified to alcohol's effects generally on an individual's ability to appreciate the consequences of his actions. (Vol. XIII, pp. 0272-73; 0276-277). Zimmerman opined that Grayson was experiencing an alcoholic blackout at the time of the murder.

He found that Grayson read at greater than a twelfth grade level. (Vol. XIII, p. 0253). Dr. Zimmerman also rescored the MMPI administered to Grayson by Dr. McClaren. (Vol. XIII, p. 0298). In the MMPI analysis of Dr. Zimmerman, it states: "The long-range prognosis for this individual is not good as this type does not learn from experience, including psychotherapy and incarceration." (Vol. XIII, p. 0298).

### N.    Lay Testimony at State Habeas Hearing

At the state habeas hearing, Grayson also submitted the testimony of numerous lay witnesses. Richard W. Bell represented Grayson at trial and on appeal. His deposition was taken and introduced; plus he testified at the state habeas hearing. Bell had been practicing law in Alabama for approximately ten

years when was appointed as defense counsel for Grayson. Although Bell had practiced in the area of criminal law prior to his appointment to Grayson's case, the defense of Darrell Grayson was Bell's first capital case. He recalls that his fee for the case was a $1,000 flat fee. Bell was the only attorney appointed to represent Grayson at the trial level. Bell explained that the thrust of his defense at the guilt phase of the trial was Grayson's lack of intent to kill Mrs. Orr. (Vol. XV, p. 0703).

The trial judge authorized him to spend the statutory maximum of $500 on experts in the case. Bell testified that he contacted some expert pathologists to seek assistance with Grayson's defense but was unable to hire those experts because their fees were more than $1500 per day. Counsel thought it would be futile to attempt to obtain funds over the statutory cap for experts from the trial judge and, therefore, he did not try. He stated that the lack of a serology expert was extremely important because he could not challenge the findings of the State's serologist regarding the rape of Mrs. Orr to ascertain whether his client was actually involved in the rape.

Counsel also opined that the testimony of an expert pathologist would have been critical in defending Grayson. He explained his opinion that the autopsy doctor never specifically testified as to the cause of Mrs. Orr's death at trial.

37

Counsel felt that he could have showed that the State's pathologist had decided on death by asphyxiation as a result of an inability to determine any other cause of death. (Vol. XV, p. 0633). Counsel wanted to explore the possibility that Mrs. Orr died of a cardiac arrest and felt that the testimony of a defense pathologist would have been crucial in showing that Grayson had not intended Mrs. Orr to die. Counsel testified that the lack of sufficient funds to hire experts caused Grayson to "just almost confess a plea to the death penalty." (Vol. XV, p. 0645).

Because Grayson had consumed gallons of alcohol prior to the killing, counsel expressed his opinion that he needed a toxicologist to develop evidence regarding the chemical effects on the body of consuming huge amounts of alcohol. Further, counsel testified that it would have been important to show the jury the genetic and physiological factors that lead to alcohol dependence and the physiological effects of such dependence, such as blackouts. (Vol. XV, p. 0651). If he could have afforded experts, counsel would have presented such evidence, both as a mitigating factor and to show a lack of intent. Finally, counsel explained that expert testimony regarding the effects of alcohol and alcohol withdrawal would have been crucial in support of his motion to suppress Grayson's confessions.

Trial counsel further testified that a good forensic psychologist would have been critical in explaining to the jury the "psychological events [that] had occurred in [Grayson's] life that may have led to him entering that home between eleven and midnight of Christmas Eve eve and committing whatever acts were done in there." (Vol. XV, pp. 0631-32). He explained that this evidence would have been critical in demonstrating to the jury that Grayson had not "intentionally killed" Mrs. Orr. According to counsel, this evidence might have produced a conviction of a lesser included offense in light of the jury's apparent concern over the intent issue as evidenced by their question to the judge regarding intent. (Vol. XV, pp. 0633-34). Further, counsel conceded that such an expert may have assisted him in developing evidence regarding Kennedy's domination of Grayson in connection with the offense.

With respect to the Bryce Hospital records, counsel testified that he received them and read them, but that he would have picked them apart if he had been able to hire a mental health expert. Counsel did not talk with any of the doctors who evaluated Grayson at Bryce Hospital prior to trial and attributed this to his lack of an investigator. Counsel was not asked during his deposition why he did not utilize the hospital records he did have at trial.

Trial counsel also expressed his opinion that it would have been important to gather facts about Grayson's home life and community in preparation of a mitigation case. Counsel talked with Grayson about his background, but did not interview other witnesses and members of the community to develop evidence for the mitigation phase of the case due to his lack of funding and investigatory help. (Vol. XV, pp. 0667-668). Bell testified that the lack of adequate funding prevented him from taking time from his busy civil practice to investigate fully the case against Grayson.

Although he did not sit through the earlier trial against Kennedy, Bell had heard that the lawyer who defended Kennedy had been extremely animated and aggressive, challenging every exhibit and witness. Because that strategy had resulted in a death sentence for Kennedy, Bell explained that his strategy was to keep Grayson's defense "calm" and under "control." He felt that he could appease the jury by presenting Grayson as calmly as possible and by accepting a lot of the damaging but admissible evidence without putting up a big fight in front of the jury. (Vol. XV, pp. 0690-91).

Counsel also explained that the case was extremely politically charged in that the Orr family was a prominent family in Montevallo, Alabama and because it was an attack on an elderly white widow by "two black individuals." (Vol. XV, p.

0681).  Due to the politically sensitive nature of the case and the prominence of the family, counsel explained that he subpoenaed every family member and then invoked the rule of sequestration of witnesses in an effort to keep them from all sitting in the front row before the jury throughout the entire trial.  Counsel conceded that the actual nature of the crime was "horrendous" and opined that the trial judge was compelled to sentence Grayson to death for political reasons.

When the jury came back with a question to the trial judge about the definition of intent and manslaughter, counsel testified that he felt that his points about Grayson's lack of intent to kill Mrs. Orr had been communicated to the jury and he felt good about the question being asked.  (Vol. XV, p. 0702) ("I just felt that this was very, very good, as far as this jury was concerned, and I was hoping that we were going to come out with the manslaughter conviction, or possibly even just a straight murder.").  He testified that the prosecutors prosecuting the case similarly felt that the jury had bought the defense case, saying to Bell: "I don't know how it happened, but I think that you whipped us on this, if that's what they're thinking." (Vol. XV, p. 0701).  Counsel testified that he felt that the judge's failure to re-instruct the jury may have cost Grayson his life.  (Vol. XV, p. 0703).

Bell explained that Grayson was a cooperative client and had informed him that he was drunk at the time of the crime. Bell did not recall being informed of a history of alcohol abuse, however. After reviewing his own preadmission form for Grayson's evaluation at Bryce Hospital, which stated "Cannot control drinking, drinks to the point of blacking out," counsel testified that he must have known of the problem.

Counsel testified that he felt that he might have secured a verdict on a lesser included offense if the trial had been held in another venue where the victim was not a well-known pillar of the community. Counsel for Grayson queried: "So, even here, and even with this jury, but without any expert help or anything else, you gave them a run for their money on the question of whether there was intent or not?" Bell answered: "That's right." (Vol. XV, p. 0727).

On examination by the State, Bell acknowledged that mental health and other mitigating evidence is a double-edged sword that often does not affect the outcome in favor of a defendant. He admitted that such evidence is sometimes so negative that defense counsel would not want to use it. He conceded that the facts of the case were horrible and that the evidence against his client was "very strong." Counsel also admitted that he thought Judge Walden would have sentenced

42

Grayson to death even if the jury had given him a life sentence. (Vol. XV, p. 0722).

Grayson's habeas counsel asked Bell on cross-examination: "Was it very important to you to investigate for the presence of mitigating circumstances about the life and background of your client, Darrell Grayson?" (Vol. XII, p. 608). Bell responded: "Yes." Counsel asked "Again, were you not about to do that because of the five hundred dollar limit, you didn't have an investigator?" He responded: "That's correct. I did not investigate, but there was possibly sociological implications in the family that would have been best served by a person trained in that kind of observations of a family unit." (Vol. XII, p. 609). Other than the fact that Grayson was from a large family and that his mother was a cafeteria worker, counsel testified that he knew very little about Grayson's background. (Vol. XII, p. 624). Thus, Bell's testimony appears to indicate that he did little or no investigation into the possibly mitigating factors present in Grayson's background. Counsel testified that he believed Grayson's alcoholism and intoxication on the night of the crime could have been a deciding factor with the jury with proper expert testimony.

Grayson's sister testified as to the drinking and violence in Grayson's childhood home. She described an argument between her sister and her mother in

43

which her mother shot her sister and an argument between her mother and her stepfather in which shots were fired in the home. (Vol. XII, pp. 422-424). Grayson's mother was convicted of manslaughter in connection with the death of her first husband Edward Grayson. (Vol. XII, p. 449, Defense Exhibit 7 in state habeas proceeding).

**O.     State Habeas Court's Order**

The state habeas court denied Grayson's petition for post-conviction relief. Without analysis, the court found all of Grayson's claims of ineffective assistance of counsel to be "without merit." With respect to Grayson's claim that his arrest violated the Fourth Amendment, the court found that claim procedurally barred due to Grayson's failure to raise the claim at trial or on appeal. In the alternative, the court found that "the evidence before the court at the time of trial did not establish that Grayson's arrest was illegal. Moreover, none of the evidence which was presented in this proceeding establishes that Grayson's arrest was not founded upon sufficient probable cause." (Vol. IX, R-34, p. 14).

The state habeas court similarly found Grayson's claim that his confessions were involuntary was procedurally barred and, in the alternative, that it lacked merit. The court found: "When all of the evidence is considered, it is apparent that Grayson's statements were properly admitted into evidence. Nothing before this

44

Court establishes that Grayson's statements were involuntary, and Grayson is not entitled to relief on this claim because it lacks merit." (Vol. IX, R-34, pp. 14-15).

With respect to Grayson's claim that he was denied sufficient funds to retain an expert forensic pathologist, the court found the claim procedurally barred and then made an alternative finding that the claim lacked merit. First, the court found that Grayson could not state a claim for the denial of funds where his counsel sought and received the maximum funding allowable under Alabama law for expert assistance. Furthermore, the court found that the lack of such pathology evidence in no way prejudiced Grayson where the expert pathologist hired by the defense in connection with the post-conviction proceedings agreed with the State's pathologist who testified at trial.

The Alabama Court of Criminal Appeals denied Grayson's appeal. Thereafter, Grayson filed a § 2254 petition, which the district court denied. Grayson timely appealed.

## II. STANDARD OF REVIEW

In reviewing the denial of Grayson's § 2254 petition, we review the district court's findings of historical fact for clear error only, reserving de novo review for its holdings of law and its application of law to facts. Housel v. Head, 238 F.3d 1289, 1294 (11th Cir. 2001) (citing Freund v. Butterworth, 165 F.3d 839, 861 (11th

Cir. 1999), <u>cert. denied</u>, 528 U.S. 817 (1999)).[7]  The district court entered a

Certificate of Appealability ("COA") on five issues, which we address in turn.[8]

## III.  INEFFECTIVE  ASSISTANCE OF COUNSEL CLAIMS

Grayson contends that his trial counsel, Richard Bell, was ineffective.  We

---

[7] Because Grayson's § 2254 petition was filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act, the pre-1996 version of § 2254 governs his petition.  See <u>Housel v. Head</u>, 238 F.3d 1289, 1292 n.1 (11th Cir. 2001) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997)).  Thus, the deferential standard of review applied to state court judgments under the AEDPA is not applicable to Grayson's claims on appeal.

[8] Although the district court actually granted a COA with respect to <u>six</u> issues, both parties have combined two of the issues in their briefs.  For the sake of consistency with the parties' arguments, we analyze Grayson's claims with respect to these <u>five</u> issues discussed in the parties' briefs:

(1)    Whether Mr. Grayson was denied the effective assistance of counsel by his lawyer's failure to move to suppress evidence based upon the Fourth Amendment to the Constitution of the United States?

(2)    Whether Mr. Grayson was denied the effective assistance of counsel by his counsel's failure to gather and present evidence of his defenses with respect to intent and intoxication at the guilt/innocence phase of the trial?

(3)    Whether Mr. Grayson was denied the effective assistance of counsel at the penalty phase by his lawyer's failure to investigate and present mitigating evidence, including expert reports and testimony regarding his childhood, alcoholism, intoxication at the time of the offense, and general mental health?

(4)    Whether Grayson's Fifth Amendment privilege against self-incrimination was violated by the admission of his alleged involuntary statements to law enforcement into evidence?

(5)    Whether Grayson was denied his rights to a fair trial and due process of law by the State of Alabama's denial of sufficient funds to hire a forensic pathologist?

The district court's entry of a COA under § 2253, rather than a Certificate of Probable Cause ("CPC"), is consistent with recent Supreme Court authority directing that a COA under AEDPA-amended § 2253 is required for all appeals taken after AEDPA's effective date.  <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000); <u>see also</u> <u>Housel v. Head</u>, 238 F.3d 1289, 1292 n.2 (11th Cir. 2001).

discuss the applicable law and then Grayson's claims.

## A.    General Principles

The Supreme Court set forth the standard governing claims of ineffective assistance of counsel in  Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness, and (2) that the deficient performance prejudiced the defense:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

 Strickland, 466 U.S. at 687.  In a capital case, this two-part test applies to claims of ineffective assistance of counsel during the sentencing phase, as well as the guilt phase of the trial, because a "capital sentencing proceeding . . . is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial – to ensure that the adversarial testing process works to produce a just result under the standards governing decision." Collier v. Turpin, 177 F.3d 1184, 1198 (11th Cir.

47

1999) (quoting Strickland, 466 U.S. at 686-87).

The standard for judging counsel's performance is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. There is a strong presumption that counsel's conduct falls within the "wide range of reasonable professional assistance." Waters v. Thomas, 46 F.3d 1506, 1511-12 (11th Cir. 1995) (en banc) (quoting Strickland, 466 U.S. at 689); see also Housel v. Head, 238 F.3d 1289, 1294 (11th Cir. 2001); Bolender v. Singletary, 16 F.3d 1547, 1557 (11th Cir. 1994) ("It is important to note that judicial scrutiny of an attorney's performance is appropriately highly deferential because the craft of trying cases is far from an exact science; in fact, it is replete with uncertainties and obligatory judgment calls."); Strickland, 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular defendant in the same way."). Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).

Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take. See Holladay v. Haley, 209 F.3d 1243, 1253 n.6 (11th Cir. 2000) ("A tactical decision is ineffective only 'if it was so patently unreasonable that no competent attorney would have chosen it.'") (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)); Waters, 46 F.3d at 1512 (stating that the court's inquiry was whether some reasonable attorney could have acted as the petitioner's attorneys did in his trial).

Furthermore, an attorney's performance is to be evaluated from his perspective at the time, rather than through the prism of hindsight. Strickland, 466 U.S. at 689. "The widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight -- except perhaps the rule that we will not judge trial counsel's performance through hindsight." Waters, 46 F.3d at 1514. "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776 (1987)). With these principles in mind, we examine Grayson's

49

claims that his counsel was ineffective in the following respects.

**B.      Ineffective Assistance in Motion to Suppress**

Defense counsel moved to suppress Grayson's confessions based upon the Fifth Amendment but not the Fourth Amendment.  Grayson argues that his arrest on December 24, 1980 was without probable cause and that trial counsel was ineffective in not asserting this Fourth Amendment violation in a motion to suppress his confessions, a hair from his sock, and Mrs. Orr's wedding rings.

The fact that there was probable cause for Grayson's arrest defeats this claim.  Probable cause within the meaning of the Fourth Amendment has been described  as more than bare suspicion: "Probable cause exists where the facts and circumstances within [law enforcement officers'] knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1948) (quotation omitted).  "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating *** often opposing interests.  Requiring more would unduly hamper law enforcement.  To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Beck v. Ohio, 379 U.S. 89, 91 (1964) (quoting Brinegar, 338

50

U.S. at 176).

In light of the evidence in the record, officers had probable cause to arrest Grayson on December 24, 1980. The officers investigating Mrs. Orr's murder and the burglary of her home testified that they spotted a trail of playing cards leading from Mrs. Orr's house in the direction of the house where Victor Kennedy resided. In this small community, Kennedy was a known convicted burglar who had been arrested by the investigating officers some fifteen times in the past, including recently. Indeed, one of Kennedy's recent burglaries had gone along the same route followed by the trail of cards.

The evidence also showed that the officers knew prior to Grayson's arrest that Kennedy and Grayson were seen together on the evening of the crime at a convenience store and that Grayson and Kennedy were friends. Further, officers testified that they were made aware that Grayson had worked for Mrs. Orr in the past and that he was familiar with her home, leading further to their reasonable suspicion about his involvement in the crime. Then when Grayson was located, officers found Grayson squatting in the bushes in a wooded area near his home and took him into custody. In the context of the small community of Montevallo, this series of links, (1) between the direct physical evidence found at the crime scene and Kennedy, a known burglar who had used the same trail before, (2) between

51

Kennedy and Grayson the very night of the crime, and (3) between the victim and

Grayson, were sufficient to support a showing of probable cause and Grayson's

counsel did not perform unreasonably in failing to challenge the evidence obtained

incident to Grayson's arrest on Fourth Amendment grounds.[9]

Grayson does not attempt to refute this evidence. Indeed, he concedes that

he and Kennedy were friends, that they had been together the evening of the

murder, and that he was located squatting in the bushes in a wooded area near his

home. Grayson's trial testimony and statements to police further corroborate that

Grayson and Kennedy made several trips to purchase alcohol on the night in

question, during which they could have been seen together by law enforcement

officers. Finally, Grayson has conceded that he was employed by Mrs. Orr at some

point prior to killing her and that her home was, in fact, selected as a target due to

---

[9] Although the above facts are sufficient to support probable cause, we note that there may have been additional evidence leading the officers to reasonably suspect and arrest Grayson. The playing cards matching the cards found in Mrs. Orr's home and on the trail leading away from her home were found in Victor Kennedy's bedroom on December 24, 1980 after a consensual search of the home where he lived. One of the officers who participated in the search that led to the discovery of these cards in Kennedy's bedroom, John Pratt, was the officer who arrested Grayson that same afternoon. Although Grayson claims that the officer conducted this search and discovered these cards after his arrest, the record does not establish that. In light of the evidence that the arresting officer conducted two interviews with Grayson after taking him to the police station on December 24, 1980, it appears possible that the search of the Kennedy home took place prior to Grayson's arrest and that Pratt was aware of the match between the cards at Kennedy's house at the time he spotted Grayson. (Vol. III, pp. 607, 609) (noting Pratt's presence at search of Kennedy house and signature on consent to search form). However, because the record is not clear, and this fact is not needed to support probable cause, we do not rely on it.

Grayson's familiarity with it. This, if anything, confirms the reasonableness of the officers' belief that Grayson was involved in this crime.

Based upon the undisputed evidence in the record, there was sufficient evidence to support a finding of probable cause.[10] Thus, counsel was not unreasonable in failing to challenge the probable cause to arrest Grayson on December 24, 1980.

Alternatively, we note that the record is silent as to why trial counsel did not pursue a motion to suppress the evidence obtained from Grayson incident to his arrest on Fourth Amendment grounds; Grayson's habeas counsel did not inquire as to trial counsel's reasons for not raising such a claim either during counsel's deposition or his testimony at the state habeas hearing. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, 'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done,

_____

[10] Stressing primarily United States v. Di Re, 332 U.S. 581 (1948), at oral argument, Grayson's counsel on appeal argues that his mere association with Kennedy was insufficient to support probable cause to arrest him for Mrs. Orr's murder. However, probable cause to arrest Grayson was supported by more than Grayson's mere association with Kennedy. In addition to knowing that the two men were friends, the arresting officers knew that Grayson and Kennedy had been seen together on the evening of Mrs. Orr's murder and that Grayson previously had worked for Mrs. Orr and was familiar with her home. When the officers began looking for Grayson in the early afternoon following the murder, they discovered him squatting in some bushes near his home. From these facts and circumstances, the arresting officers reasonably could have believed that Grayson was implicated in Mrs. Orr's murder. Furthermore, the factual circumstances in Di Re are completely different from those in this case.

and that he exercised reasonable professional judgment.'" Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999)).  Indeed, trial counsel did move to suppress Grayson's statements to law enforcement officers on Fifth Amendment grounds.  Thus, counsel was focused on the admissibility of the evidence provided to law enforcement following Grayson's arrest and challenged its admission prior to trial and at trial.  Counsel may have made a decision to focus his efforts on what he perceived to be the stronger Fifth Amendment challenge to Grayson's statements.  Such a decision would not have been per se unreasonable in light of the evidence surrounding Grayson's arrest and even assuming arguendo probable cause is arguably lacking, we must indulge the strong presumption that counsel's conduct was reasonable in the absence of evidence regarding his reasons for failing to raise such a challenge.

**C.    Ineffective Assistance at Guilt/Innocence Phase**

Grayson contends that counsel's performance during the guilt/innocence phase was defective in three respects.  First, Grayson argues that counsel should have developed and presented additional evidence at trial regarding his chronic alcoholism and intoxication at the time of the offense to negate the intent required for a capital murder offense.  Grayson focuses on what trial counsel could have

54

done, but did not. As this Court has held, "[a]lthough Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact." Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir. 2000). "Our court's proper inquiry is limited to whether th[e] course of action [followed by defense counsel] might have been a reasonable one." Id. at 1319.

At trial, defense counsel's theory was that Grayson lacked the specific intent to be guilty of capital murder. Grayson testified as to the large quantity of alcohol he and Kennedy had consumed on the night of the killing. Counsel emphasized Grayson's repeated trips to buy alcohol and his consumption of large amounts of wine right out of the bottle for several hours immediately preceding the crime. Consistent with his intoxication, Grayson repeatedly testified on direct regarding his inability to recall the specifics of the crime. Indeed, Grayson testified that he completely forgot committing the crime the next morning until his mother told him of Mrs. Orr's killing.

Grayson also testified that he had taped a pillowcase over Mrs. Orr's head and face solely to keep from being identified. Grayson testified that Mrs. Orr was breathing and alive when he left her house. Counsel directly asked Grayson if he had gone to Mrs. Orr's house to murder her, to which Grayson responded, "No sir." On cross-examination, Grayson again emphasized that he was extremely

intoxicated at the time of the crime and his problem with alcohol. He insisted that he would not have committed the crime at all if he had not been so drunk.

Defense counsel also called Grayson's mother and sister to confirm Grayson's story that he did not remember the events at Mrs. Orr's house the morning after the crime. Both Grayson's sister and mother testified to Grayson's surprise and dismay when he was told about the break-in at Mrs. Orr's house and about her death. Defense counsel also called State witness Sheriff Glasgow to confirm Grayson's story that his intoxication prevented him from recalling the events of the crime the next day. Glasgow confirmed that Grayson had expressed surprise at the discovery of Mrs. Orr's wedding rings in his own wallet and had told Glasgow that he had never seen them before.

During the State's case-in-chief, defense counsel also cross-examined the autopsy doctor with respect to the issues directly relevant to Grayson's intent to kill Mrs. Orr. Defense counsel asked the doctor whether Mrs. Orr's many injuries contributed to Mrs. Orr's death or were in any way "life-endangering injuries." The doctor conceded that the injuries had not contributed to Mrs. Orr's death by asphyxiation and were not individually life threatening.

In addition, defense counsel questioned the doctor about the pillow case taped around Mrs. Orr's head. The doctor admitted that Mrs. Orr was able to

receive some air through the pillow case and that Mrs. Orr's own bodily fluids may have filled the pores of the pillow case fabric and caused the air flow to be diminished over a period of time. Further, defense counsel asked the doctor whether there was any physical evidence that Mrs. Orr's hands had been bound at any time to prevent her from removing the pillowcase, to which the doctor replied in the negative. Defense counsel emphasized that the autopsy doctor had been able to remove the pillowcase over the top of Mrs. Orr's head without loosening or cutting the masking tape that held it. Finally, defense counsel explored with the doctor any possible connection between Mrs. Orr's arteriosclerotic disease and her death by suffocation. Counsel emphasized all of these issues tending to negate Grayson's intent in closing arguments to the jury at the guilt/innocence phase.

In light of counsel's emphasis on Grayson's alcohol consumption and lack of intent to kill Mrs. Orr at trial, we do not find that counsel's presentation of evidence regarding the intent issue fell below the standard of reasonable professional performance. Counsel highlighted the intent issue and Grayson's consumption of excessive alcohol on the night in question. In addition, counsel focused the jury on the physical and forensic evidence suggesting Grayson's lack of intent to kill Mrs. Orr. This approach was not unreasonable. See Thompson v. Haley, No. 00-15572 (11th Cir. July 3, 2001).

Grayson claims that counsel was ineffective despite these efforts because counsel did not present additional evidence with respect to the intent issue. First, Grayson claims that available information in the Bryce Hospital records regarding his intoxication on the night of the offense and his alcoholism generally should have been utilized. Again, Grayson's state habeas counsel never asked defense counsel his reasons for not introducing these records that were in his possession and we must, therefore, presume that the lawyer's decision not to present this evidence at trial was a reasonable one.[11]

This presumption is amply supported by the Bryce Hospital records themselves. First, it is clear from the records themselves that the opinions regarding Grayson's level of intoxication on the night of the crime and his alcoholism generally are derived exclusively from Grayson's self-reports. As such, those opinions appear no more credible than Grayson's own trial testimony in this regard and would have been merely cumulative on the intoxication issue. At best, this evidence would have been of limited benefit to the defense case. More importantly, defense counsel's use of these particular records at trial would have

_____

[11] During his deposition, counsel testified that he received and read the reports from Bryce Hospital. (Vol. XV, p. 660). While habeas counsel questioned trial counsel as to whether he would have conducted investigation into the Bryce Hospital findings with the assistance of expert witnesses and investigators, habeas counsel did not inquire as to why trial counsel failed to utilize the Bryce Hospital reports at trial in the absence of such assistance. (Vol. XV, pp. 660-62).

58

opened the door for the State to put before the jury significant information

contained in the records that could have damaged the defense.[12]

For example, some information in the reports painted Grayson as a recreational

alcohol abuser who lived off women and used alcohol as an excuse for his poor

---

[12] For example, the records included the following observations regarding Grayson:

- His whole life since age 16 apparently has been a continuous drunken state with dependence on his friends for money and whiskey. (Lunacy Commission Report, Vol. V, 00108-09).

- This is a 20 year old black male who admits drinking since age 14, and to being an alcoholic since age 16. He has a poor work record, lived off his mother who provided for him, and off of his female companions who supported his alcoholic need and habit. He has little or no maturation and tends to use his alcoholism as an excuse but never sought help for it. He has amnestic periods and apparently has had alcoholic hallucinosis while drinking heavily. I see no problem in the sphere of affect or insight and judgment. I see no evidence of a thought disorder with a framework of a delusion system and/or hallucinatory manifestations. (Lunacy Commission Report, Vol. V, 00110).

- He could remember the crime quite well. He did state he was quite intoxicated. He states he has seen things that were not there, many times after drinking. He states that occurred the morning after the alleged crime, but he was not seeing them when the crime was committed nor when the police questioned him.

- The patient scored a verbal IQ of 91, a performance IQ of 94, for a full scale IQ score of 92, placing him in the average range of intellectual functioning. (Report of Psychological Evaluation Vol. V, 00115).

- Mr. Grayson has made statements to law enforcement authorities that he would never be taken to court. It is suspected that he will attempt to escape if given the opportunity. (Treatment Notes Vol. V, 00125).

- Darrell Grayson's alleged criminal activity is not viewed as being the product of a mental disease, defect, or derangement. Therefore, in our opinion, Mr. Grayson did possess the substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law at the time of the particular acts charged. (Lunacy Commission Report Vol. V, 00147).

59

behavior.  Further, the reports would have told the jury that Grayson was an individual of average intelligence who appreciated the criminality of his conduct on the night in question.  Grayson's statement that he "would never be taken to court" would have contradicted counsel's efforts to paint Grayson as accepting responsibility for the crime and truthfully denying any intent to cause the victim's death.  Finally,  statements in the reports that Grayson recalled the crime quite clearly would have impeached his trial testimony regarding his lack of recall.  Thus, the Bryce Hospital  records were potentially very damaging to the defense.  As such, counsel's failure to utilize these records at trial does not amount to deficient representation.[13]

Grayson also argues that trial counsel was ineffective in failing to gather and present a defense expert regarding intoxication and alcoholism and their effects on an individual's ability to appreciate and understand the consequences of his actions.  Given the limited resources available, both financial and temporal, counsel's approach to the intent issue at the guilt/innocence phase of Grayson's trial and failure to retain and present expert testimony regarding alcoholism was reasonable.  See Chandler, 218 F.3d at 1318 n.22 ("As we have recognized,

[13] Indeed, trial counsel's deposition testimony that he would have used experts to "take[] [the report] apart" demonstrates his conclusion that the report contained information harmful to Grayson.  (Vol. XV, p. 0660).

60

Strickland's approach toward investigation 'reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources.' How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court.") (citations omitted). This is especially true with respect to expert testimony regarding alcohol consumption. While detailed expert testimony regarding the effects of alcohol on an individual's appreciation of consequences may have been helpful to the jury, the effects of excess alcohol consumption are not necessarily outside the ken of the average juror.[14] See United States v. Boyles, 57 F.3d 535, 551-52 (7th Cir. 1995) (rejecting claim of ineffective assistance of counsel which was based, in part, on trial counsel's failure to present expert testimony regarding intoxication, and noting that: "In recent years, there has been

---

[14] We say that such expert testimony "may" have been helpful because it is possible that reasonable defense counsel in a case such as this could conclude that such expert testimony regarding a defendant's intoxication would not be helpful. See Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir. 1994) ("Precedents show that many lawyers justifiably fear introducing evidence of alcohol and drug use."). Although counsel in this case did not testify that he made a strategic decision to downplay the intoxication defense at trial and testified that he would have wanted expert testimony regarding alcohol consumption, we note that reasonably competent counsel could have made such a strategic decision. It is conceivable that undue emphasis on a defendant's intoxication -- beyond communication of the fact of intoxication itself -- could potentially alienate the jury as an attempt to excuse truly horrendous conduct. In this case, undue emphasis on Grayson's intoxication could have undermined defense counsel's attempt to show Grayson's acceptance of responsibility for what he had done. Indeed, counsel specifically told the jury in closing that the defense was not suggesting that Grayson's voluntary intoxication completely absolved him of fault with respect to Mrs. Orr's death. Because defense counsel in this case disavowed any such strategic decision, it is not directly relevant to our finding of effective representation in this case. However, it is important to note that "[c]onsidering the realities of the courtroom, more is not always better." Chandler, 218 F.3d at 1319.

much media and television coverage dedicated to the problems of the use of alcohol, educational awareness programs from groups such as M.A.D.D., government mandated labels on bottles warning of the effects of alcohol consumption, and articles and reports concerning domestic violence and sexual assault involving alcohol consumption. In light of all of this information, as well as the jurors's common knowledge and experience in the everyday affairs of life, we are of the opinion that they were more than capable of concluding that [the victim was capable of communicating her lack of consent to the defendant despite her intoxication]").

Grayson points out trial counsel's own testimony at the state habeas hearing that he would have wanted expert evidence had he been able to afford it and that he realized the importance of expert assistance in defending a later capital case. As we have said many times before, a court should avoid "the distorting effects of hindsight" in reviewing a lawyer's performance and should look to "counsel's perspective at the time." Chandler, 218 F.3d at 1316 (citing Strickland, 466 U.S. at 689). Thus, even counsel's own hindsight regarding what might have influenced the jury cannot support a finding of deficient performance.[15] "[I]t is all too easy for

---

[15] "[B]ecause ineffectiveness is a question which we must decide, admissions of deficient performance by attorneys are not decisive." Harris v. Dugger, 874 F.2d 756, 761 n.4 (11th Cir. 1989).

a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Because counsel's presentation of evidence regarding the issue of intent and Grayson's intoxication were reasonable under the circumstances facing counsel at the time, counsel's failure to do something more does not rise to the level of ineffective assistance of counsel. See Chandler, 218 F.3d at 1313 ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (quoting Burger v. Kemp, 483 U.S. 776 (1987)). In sum, Grayson's presentation of evidence at trial to negate the element of intent was not ineffective.

Grayson next contends that counsel's closing argument to the jury regarding intent was ineffective, but the transcript of that argument belies this assertion. Counsel emphasized that the key question in the case was one of "intent." "The key word in that indictment for consideration by you is intentionally." (Vol. IV, R-1043). "The evidence ladies and gentlemen, unequivocably [sic] to me does not demonstrate a capital offense." (Vol. IV, R-1043). "Take a look at the intent to kill this woman." (Vol. IV, R-1043). "Darrell said to you right there that he didn't go down there to kill this woman." (Vol. IV, R-1043). "I submit to you that the

scientific evidence . . . doesn't indicate that kind of killing." (Vol. IV, R-1043). "Now I submit to you that there is no specific intent and there was no intent to end the life of Mrs. Orr when he went to that home." (Vol. IV, R-1050). "Just as randomly as we have been brought together here today, I submit to you that as randomly that the facts fell into position on the night of the 23rd of December, 1980." (Vol. IV, R-1050-51). "[W]eighing [the evidence] with what has been charged in that written indictment that he intentionally killed Mrs. Orr, or with the intent to kill Mrs. Orr, it is not there." (Vol. IV, R-1052).

Defense counsel highlighted the testimony of the autopsy doctor that none of Mrs. Orr's injuries were life-threatening and that the injuries did not contribute to her death by asphyxiation. Thus, the injuries inflicted evidenced no intent to kill the victim. Counsel also queried why Grayson had not simply shot Mrs. Orr with the .38 pistol carried by Kennedy rather than bind her head in a pillowcase if the intent was to kill her. "If, in fact, Darrell went there to kill Mrs. Orr, he had the means readily available." (Vol. IV, R-1044). Counsel stated that Grayson was strong enough to kill the small and weak Mrs. Orr with his bare hands if his intent had been to kill her. Defense counsel suggested that Grayson could have killed her more easily in that fashion if death had been his intent. Defense counsel also focused the jury on evidence that Mrs. Orr's hands were never bound by Grayson

64

and Kennedy. If the intent of the pillowcase had been murder, counsel asked why the defendants would leave her hands free to remove the pillowcase from her face. "Another aspect about this intent that causes a question to me is the fact that Mrs. Orr's hands were not tied." (Vol. IV, R-1045).

In arguing the lack of specific intent, defense counsel made references to Grayson's intoxicated state at the time of the crime. "We are not saying voluntary intoxication completely absolves him of his fault." (Vol. IV, R-1052). "Why would two individuals, able bodied as Darrell was at that time and Victor Kennedy, drink themselves into a position of feeling power possibly, feeling that they need to have a reward for Christmas holidays or spending money for whatever reason around the Christmas holidays. Whatever was going through their system because of the cultural background, I don't know." (Vol. IV, R-1051). Counsel encouraged the jury to come back with a verdict of a lesser included offense. "[Y]ou will have the opportunity not just to come back with a verdict of capital offense but manslaughter, murder and these offenses that may have been committed by my client, Mr. Grayson." (Vol. IV, R-1058). Defense counsel told the jury that Grayson was ashamed for what he had done and commended him for telling the truth from the start about his conduct and accepting whatever punishment resulted. Counsel also pointed out to the jury that Grayson had no

prior record of violent crime and came from a family and cultural background that may have influenced his actions.

Counsel's closing argument focused the jury on all the evidence, direct and circumstantial, that tended to negate Grayson's specific intent to kill. While there is undoubtedly always something more that could have been said in every case, counsel's closing argument at the guilt/innocence phase of Grayson's trial was far from unreasonable under the circumstances. Therefore, counsel was not ineffective in this regard.

Finally, Grayson contends that counsel's performance in the guilt/innocence phase was defective because counsel failed to request a reinstruction of the jury regarding intent following the jury's question to the court. In hindsight, trial counsel testified that the judge's failure to reinstruct the jury may have cost Grayson his life. Looking to the lawyer's conduct from his perspective at the time of the jury question, however, it is clear that his failure to request a reinstruction was not unreasonable. First, it is important to note that at the same time the trial judge informed counsel that a question had been posed, the judge stated that he felt that the original instruction was adequate and that additional charges to the jury were not appropriate. Because the jury had been instructed regarding intent only forty minutes prior to the question and because reinstruction of the jury is within

66

the trial judge's discretion, defense counsel was not unreasonable in failing to pursue such an instruction after the judge's statements that no additional instruction was appropriate at that time. See Grayson v. State, 675 So. 2d 516, 523-24 (Ala. Crim. App. 1995) (reinstruction of the jury is within the trial judge's discretion under Alabama law).

Further, counsel's failure to ask for additional instruction was reasonable in light of his perspective at the time the jury came back with a question: counsel testified that he felt that his points about Grayson's lack of intent to kill Mrs. Orr had been communicated to the jury and that he felt optimistic about the question being asked. (Vol. XV, p. 0702) ("I just felt that this was very, very good, as far as this jury was concerned, and I was hoping that we were going to come out with the manslaughter conviction, or possibly even just a straight murder."). He testified that the prosecutors similarly felt that the jury had bought the defense case, saying to Bell: "I don't know how it happened, but I think that you whipped us on this, if that's what they're thinking." (Vol. XV, p. 0701). Therefore, in light of the perspective of both the defense and the prosecution at the time that the jury had understood the intent defense, counsel's failure to ask for additional instructions as to intent was not unreasonable. As testified to at the state habeas proceeding: "[s]o, even here, and even with this jury, but without any expert help or anything

67

else, you gave them a run for their money on the question of whether there was intent or not?"  Bell answered: "That's right."  (Vol. XV, p. 0727).

Finally, it is important to examine the jury charge given in determining counsel's failure to ask for reinstruction.  The record demonstrates that the court gave the jury repeated instructions about the element of intent and the necessity of a finding of an "intentional killing" to support the capital offenses contained in the indictment.  For this reason as well, counsel's failure to request reinstruction was not unreasonable.

## D.    Ineffective Assistance at Sentencing Phase

Grayson next contends that trial counsel was ineffective at the sentencing phase due to counsel's failure to gather and present the evidence developed during Grayson's state habeas proceedings regarding: (1) Grayson's impoverished and dysfunctional family background; (2)  Grayson's history of alcoholism; (3) Grayson's intoxication at the time of the offense; (4) Grayson's domination by his co-defendant; (5) Grayson's remorse over Mrs. Orr's death; and (6) Grayson's family's desire that his life be spared.

"The purpose of a sentencing hearing is to provide the jury with the information necessary for it to render an 'individualized sentencing determination . . . [based upon] the character and record of the individualized offender and the

68

circumstances of the particular offense." Dobbs v. Turpin, 142 F.3d 1383, 1386-87 (11th Cir. 1998) (quoting Penry v. Lynaugh, 492 U.S. 302, 316 (1989) (citations omitted)). "A sentencing jury should 'not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Id. at 1387 (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis in original)).

Although no absolute duty exists to investigate particular facts or a certain line of defense, this Circuit has held that, in preparing for a death penalty case, "[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994) (citations omitted). "A failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history." Housel v. Head, 238 F.3d 1289, 1294 (11th Cir. 2001). However, counsel is not required to investigate and present all mitigating evidence in order to be reasonable. See Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999). For that reason, even when trial counsel's investigation and presentation is less complete than collateral counsel's, trial counsel has not performed deficiently when a

69

reasonable lawyer could have decided, under the circumstances, not to investigate or present particular evidence.  See Housel, 238 F.3d at 1294.

In this case, we need not decide whether counsel's performance was in fact deficient because Grayson so clearly fails to satisfy the prejudice prong of the Sixth Amendment analysis.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Under the prejudice prong of Strickland, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  Id. at 693. Instead, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 695; see also Tompkins v. Moore, 193 F.3d 1327 (11th Cir. 1999); Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) ("Our analysis of the prejudice prong, however, must also take into account the aggravating circumstances associated with Dobbs's case, to determine whether 'without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different.'") (quoting Bolender, 16 F.3d at 1556-57); see also Chandler v. United States, 218 F.3d 1305, 1328 (11th Cir. 2000) ("The ultimate question is whether Chandler has shown that

70

any deficient performance prejudiced him such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different.") (Cox, J., specially concurring).

Even assuming arguendo ineffective assistance in the mitigating case at sentencing, there is no reasonable probability that the balance of aggravating and mitigating circumstances that led to the imposition of the death penalty in this case would have been different had counsel introduced the evidence compiled and presented in Grayson's state habeas proceedings. Two aggravating circumstances were found during the sentencing phase: (1) that the murder was committed during the commission of a rape, robbery, and burglary and (2) that the murder was especially heinous, atrocious, and cruel, especially when compared to other capital felonies. (Vol. V, Order on Imposition of Death Penalty, p. 0202). Several mitigating circumstances were also found: (1) Grayson had no long history of prior criminal involvement; (2) Grayson was nineteen years old at the time of the offense; and (3) Grayson was "relatively poor and unemployed, had abandoned his education in the tenth grade, although he did receive training at a technical school, had been raised without a father, and had given his mother little trouble in growing up, at the time of the capital felony." (Vol. V, pp. 0203-0204.)

The sentencing judge specifically rejected several other possible mitigating

71

circumstances.  The court found that "[t]here was no evidence that the Defendant was under the influence of extreme mental or emotional disturbance while committing the capital felony."  (Vol. V, p. 0203).  Further, the court found that "[w]hile the Defendant was an accomplice in the capital felony, he did in fact commit the capital felony and certainly his participation was not relatively minor."  (Vol. V, p. 0203).  With respect to Grayson's domination by his co-defendant, the sentencing judge found that there was no compelling evidence that Grayson acted under extreme duress or the substantial domination of any other person.  (Vol. V, p. 0204).  Finally, the court found that there was "no compelling evidence that the Defendant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.  He clearly knew what he was going to do, what he was doing, and what he did, was wrong and illegal."  (Vol. V, p. 0204).

Based upon these factual findings, the sentencing judge found that "the actions of the Defendant were completely barbaric, showing a complete and utter disregard for not only human life, but human dignity.  The Court cannot think of a case it has seen, heard, or even read, that would equal the cruelty shown in this case by the Defendant to Mrs. Orr.  Indeed, the Court has some difficulty i[n] imagining what more the Defendants could have done to make this crime any more

72

heinous, atrocious, or cruel."[16]  (Vol. V, p. 0203).

In light of the brutal nature of this crime against an elderly victim and the specific findings made by the court that sentenced Grayson to death, we find no reasonable probability that the mitigating circumstances gathered and presented in connection with Grayson's state habeas proceedings would have altered the balance of aggravating and mitigating factors in this case.   First, none of the evidence developed in connection with the state habeas proceedings served to alter in any way the aggravating circumstance of a heinous and atrocious crime that supported the imposition of the death penalty in this case.  The medical evidence presented at the state habeas proceeding, like the evidence at trial, showed that Mrs. Orr lived through a substantial portion of her ordeal, fighting her attackers and attempting to defend against repeated rapes, before finally dying.  (Testimony of Dr. Joseph Burton, Vol. XII, p. 491) (opining that Mrs. Orr's  bruises show that she was not unconscious during the attack, but awake and struggling).  Grayson

---

[16] The Alabama Criminal Court of Appeals similarly found that Grayson's conduct was reprehensible:

> The sentence of death is unquestionably proper for Grayson who burglarized, beat, terrorized, raped, and suffocated to death a helpless 86-year-old lady.  Both Kennedy's and Grayson's crimes are more characteristic of the actions of wild ravaging dogs of hell rather than even the lowest and most depraved level of humanity.

Grayson v. State, 479 So. 2d 69, 75-76 (Ala. Crim App. 1984).

offered nothing at the state habeas hearing to alter his statements or his trial testimony that he repeatedly raped Mrs. Orr and that he taped the pillow case that killed her over her head. Nothing presented at the state habeas hearing undermined Grayson's trial testimony that he could have worked for the money he wanted, but that he had terrorized Mrs. Orr for it instead. Nor did the evidence presented at the state habeas hearing change Grayson's statements that he raped and terrorized Mrs. Orr to the point that he thought she might have a heart attack even though she had always been nice to him. Thus, the mitigating evidence not heard by the judge and the jury would not have served to alter the extreme aggravating circumstances present in this case.

Second, some of the information developed at the state habeas hearings may have been harmful to Grayson's request for a life sentence. The jury would have heard that Dr. Zimmerman's MMPI analysis of Grayson stated that Grayson was not a candidate for rehabilitation. (Vol. XIII, p. 0298) ("The long-range prognosis for this individual is not good as this type does not learn from experience, including psychotherapy and incarceration."). The jury also would have heard Dr. McClaren's testimony that Grayson received a verbal IQ score of 88, a performance IQ of 80, and a full scale IQ of 83, which suggests average intellectual functioning. (Vol. XI, p. 253). The jury also would have heard

McClaren's opinion that Grayson was able to appreciate the consequences of his actions on the night of the murder despite his intoxication. (Vol. XI, p. 275). Furthermore, we note that emphasizing Grayson's alcoholic youth and intoxication may also have been damaging to Grayson in the eyes of the jury. See Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing.") (citing Waldrop v. Jones, 77 F.3d 1308, 1313 (11th Cir. 1996)); Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir. 1994) ("Precedents show that many lawyers justifiably fear introducing evidence of alcohol and drug use."); Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994) (noting reasonableness of lawyer's fear that defendant's voluntary drug and alcohol use could be "perceived by the jury as *aggravating* instead of mitigating") (emphasis in original). Despite presenting evidence regarding Grayson's horrific childhood, Grayson presented no evidence that any of his eleven siblings had ever been convicted of any violent crime.[17] The fact that Grayson was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation. Thus, some of the "mitigation" evidence presented at the state habeas hearing

---

[17] While the family study prepared by Dr. Cleveland did show that six of Grayson's siblings had spent time in jail, there was no evidence presented that any of the other children were sent to jail for violent crimes.

actually may have been damaging to Grayson in the eyes of the judge and jury that sentenced him to death.

Third, some of these mitigating factors were known to the jury and the sentencing judge. They heard testimony that Grayson was intoxicated, that he was "bad with alcohol," and that he would not have committed the crime if he had been sober. The jury was specifically instructed that voluntary intoxication could negate a defendant's intent. Nonetheless, the jury recommended a sentence of death and the trial judge imposed a sentence consistent with that recommendation. The sentencing judge made a factual finding that Grayson had been drinking wine on that night.

Although the expert testimony presented at Grayson's state habeas proceedings offered a more complete picture of the possible role of alcohol in Grayson's history and in Mrs. Orr's death, we cannot find a reasonable probability that it would have changed the outcome for Grayson's sentencing judge or the members of the jury, all of whom heard testimony that Grayson was heavily intoxicated and that he would not have committed the crime but for alcohol.

The sentencing judge also acknowledged Grayson's family and cultural background as a mitigating circumstance in this case. He noted Grayson's impoverished background, his lack of education, and the absence of a father figure

76

in his life. Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history.[18]

In sum, we find no reasonable probability that the balance of aggravating and mitigating circumstances underlying Grayson's death sentence would have been different if the judge and jury had heard the state habeas evidence. "We note that '[m]any death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping.'" Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) (emphasis added) (quoting Jackson v. Herring, 42 F.3d 1350, 1369 (11th Cir. 1995)). "In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Id. (citing Francis v. Dugger, 908 F.2d 696, 703-04 (11th Cir. 1990) (finding that the failure to present mitigating evidence of a deprived and abusive childhood did not prejudice capital defendant at

---

[18] We note that Grayson's counsel expressed his opinion during the state habeas proceeding that the judge would have sentenced Grayson to death despite the presentation of additional mitigating circumstances.

trial for torture-murder of government informant) and <u>Thompson v. Wainwright</u>, 787 F.2d 1447, 1453 (11th Cir. 1986)).

In <u>Thompson v. Wainwright</u>, 787 F.2d 1447 (11th Cir. 1986), this court found that Thompson's trial counsel <u>was</u> ineffective in connection with the capital sentencing phase of his murder trial. In that case, Thompson and a co-defendant pled guilty to the brutal torture-murder of a woman at a motel after she failed to supply them with sufficient money. <u>Id.</u> at 1448. This court found that Thompson's counsel was ineffective in handling the capital sentencing trial that followed the guilty plea where counsel: (1) failed to investigate the background of the co-defendant; (2) failed to consider offering psychiatric reports despite counsel's belief that the defendant was retarded; and (3) failed to investigate the defendant's background, including early family life, school records, and service records. <u>Id.</u> at 1451-52.

Thompson's school records, ignored by his trial counsel, indicated that Thompson was "mildly retarded," that he had "poor motor skills," was "hyperactive and difficult." <u>Id.</u> at 1453. Four psychiatric reports prepared in advance of trial and ignored by Thompson's counsel revealed Thompson's troubled childhood and other potentially mitigating evidence: "[t]hree of the psychiatrists diagnosed Thompson as having a personality disorder; the fourth

questioned the extent of Thompson's participation in the crime due to possible intoxication and drug use." Id. at 1453. Further, investigation regarding Thompson's co-defendant revealed that the co-defendant "was involved with violent motorcycle gangs, had been convicted of intimidating a government witness, and at age fourteen had killed a playmate." Id.

Despite the existence of this mitigating evidence that was unreasonably ignored and omitted by Thompson's counsel during Thompson's sentencing trial, this court found no prejudice:

> Even had the jury heard this evidence, however, we are confident that Thompson's sentence would have been the same. The jury's determination was strongly supported by the aggravating circumstances introduced in the record. Nothing [counsel] could have presented would have rebutted the testimony concerning Thompson's participation in the brutal torture murder. The testimony indicated that although Surace initiated the beatings, Thompson took over, beating the victim with a chain, his fist, a chair leg, and a billy club. The testimony also indicated that it was Thompson who actually raped the victim with the chair leg and billy club. After hearing testimony that Thompson committed these atrocities, the jury heard nothing from Thompson himself in reply. . . . We do not believe that there is a reasonable probability that evidence of a difficult youth, an unsavory co-defendant, and limited mental capacity would have altered this jury's decision.

Id. at 1453. Thus, in light of the horrific nature of the killing, the court did not find a Sixth Amendment violation despite counsel's unreasonable handling of the sentencing phase of Thompson's case. See also Thompson v. Haley, No. 00-15572

79

(11th Cir. July 3, 2001); Gilreath v. Head, 234 F.3d 547, 552 (11th Cir. 2000) (finding no reasonable probability that relatively weak mitigation evidence would have changed outcome of capital sentencing); Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999) (finding no prejudice to support claim of ineffective assistance of counsel in capital case because aggravating circumstances surrounding strangulation of fifteen year old girl in the course of a sexual assault outweighed additional mitigating circumstances that could have been presented at sentencing of defendant's physical abuse as a child, substance abuse problems, and mental deficiencies); Clisby v. Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994) (finding no prejudice from failure to present additional mitigating evidence at capital sentencing and stating: "[W]e are aware that, in reality, some cases almost certainly cannot be won by defendants. Strickland and several of our cases reflect the reality of death penalty litigation: sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder – or, even a less brutal murder for which there is strong evidence of guilt in fact.") (emphasis in original); Daugherty v. Dugger, 839 F.2d 1426, 1432 (11th Cir. 1988) ("given the severity of the aggravating circumstances," failure to present psychiatric testimony was not prejudicial); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986) (rejecting claim of ineffective assistance of counsel in

sentencing phase under prejudice prong where aggravating circumstances of murders and direct evidence of guilt outweighed the relatively weak mitigating evidence available).[19]

As in Thompson, the murder in this case involved torture for money: Grayson and Kennedy repeatedly and brutally raped an 86 year-old woman when they could not find sufficient money to satisfy their greed. Despite Mrs. Orr's pleas that they take anything they want and leave her unharmed, Grayson and his co-defendant continued to beat and sexually assault her. As in Thompson, the victim survived this brutal ordeal, dying only after Grayson and Kennedy were through with her. Although the jury did hear from Grayson in this case, Grayson

---

[19] Cf. Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) (finding prejudice from trial counsel's complete failure to investigate or present mitigation case at capital sentencing where defendant had shot store owner in robbing store and stating, "The aggravating circumstances surrounding Dobbs's case, while deplorable, do not rise to such a level as to overshadow the significant mitigating evidence that Dobbs's jury had no occasion to consider."); Jackson v. Herring, 42 F.3d 1350, 1369 (11th Cir. 1995) ("Many death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping. Jackson's crime, by contrast, executed with a single plunge of a knife, apparently was borne of irrational and sudden temper. Evidence showing the genesis of Jackson's irrational rage through an abusive upbringing, in addition to evidence of Jackson's good character in her relationships with her family and her employment history, thus might well have benefitted the defense far more than the argument presented."); Horton v. Zant, 941 F.2d 1449, 1463 (11th Cir. 1991) (finding that counsel's unreasonable failure to investigate and present mitigating evidence prejudiced capital defendant in case involving impulse shooting during thwarted robbery); Harris v. Dugger, 874 F.2d 756, 763-64 (11th Cir. 1989) ("Many death penalty cases involve planned murders, but here the evidence fails to show that the appellant set out to kill Essie Daniels when he entered her home. Instead, the appellant appears to have embarked on a weaponless burglary during which he was surprised by the victim who produced the knife and apparently struck the first blow.").

did not deny any of these extreme aggravating factors.   As in <u>Thompson</u>, nothing

contained in the mitigating evidence undermined Grayson's active participation in

this heinous crime.  Therefore, we are confident that Grayson's sentence would

have been the same despite the presentation of mitigating circumstances in light of

the brutality of the crime against an elderly widow who had been nothing but nice

to him.[20]   Thus, Grayson has failed to meet his burden of demonstrating that he

was prejudiced by the absence of additional mitigating evidence at sentencing and

his Sixth Amendment claim fails.

## IV.  VOLUNTARINESS OF GRAYSON'S STATEMENTS TO LAW ENFORCEMENT

Grayson contends that the trial court erred in denying this motion to

suppress his confessions.  He contends that his intoxication and alcohol

withdrawal, as well the coercive environment in which he was questioned, made

his statements unreliable and involuntary.  We disagree.

The evidence offered at the suppression hearing amply supports the trial

court's finding that the confessions were voluntary.  For example, Sergeant Pratt

---

[20] Grayson relies upon <u>Williams v. Taylor</u>, 529 U.S. 362 (2000) and <u>Collier v. Turpin</u>, 177 F.3d 1184 (11th Cir. 1999) to show a Sixth Amendment violation in connection with the sentencing phase of his capital trial.   Both cases are easily distinguished for two reasons.  First, the murders in both cases involved no rape, torture, or other heinous acts similar to those committed by Grayson in this case.  Second, the mitigating evidence available in those cases was far more compelling than the evidence presented on behalf of Grayson in his state habeas proceedings.

testified that he did not smell alcohol on Grayson or see any other indications of alcohol or drug use. Grayson was not slurring his speech and the only time that Pratt experienced difficulty understanding Grayson during his interviews was when Grayson lowered his head and talked "straight to the floor." Pratt acknowledged that no alcohol or drug tests were performed despite Grayson's statements that he had consumed gallons of wine the night before. He described Grayson's general demeanor as "normal," although he admitted that Grayson appeared nervous a few times and became fidgety. The transcripts of Grayson's statements also do not suggest that he was intoxicated or suffering from alcoholic withdrawal at the time. Further, these transcripts demonstrate the officers' repeated and exhaustive efforts to apprise Grayson of his rights and to ensure that his statements were voluntarily given. In light of this record, we conclude that the trial judge did not err in denying Grayson's motion to suppress his confessions.[21]

## V. DENIAL OF SUFFICIENT FUNDS TO HIRE A FORENSIC PATHOLOGIST

Grayson's trial counsel sought funds to hire an expert forensic pathologist to

---

[21] Grayson argues that the trial court should have suppressed the statements based upon the records from Bryce Hospital regarding Grayson's intoxication and withdrawal and based upon the actual tape recordings of his statements. Even ignoring the self-serving nature of Grayson's statements to Bryce Hospital about his intoxication and assuming arguendo that these records and tape recordings would have supported Grayson's suppression motion, none of this evidence was presented to the trial judge in support of the motion. Accordingly, the denial of the motion was not error.

refute and cross-examine the findings of the State's (a) forensic pathologist who performed Mrs. Orr's autopsy and (b) serology expert who examined blood and sperm samples taken from the crime scene. The trial court granted the motion up to the $500 statutory maximum allotted by the Alabama legislature. Grayson contends that his due process rights were violated because the $500 allowed was patently insufficient to retain competent forensic expertise.

The Supreme Court set forth the standards governing a criminal defendant's due process rights to appropriate expert assistance in Ake v. Oklahoma, 470 U.S. 68 (1985). In Ake, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Ake v. Oklahoma, 470 U.S. 68, 74 (1985). In reaching this decision, the Supreme Court noted that there is no general obligation for a State to purchase for an indigent defendant all the assistance that his wealthier counterpart might buy. Rather, due process requires that an indigent defendant be given the "basic tools" necessary to present his defense. Taking into account the defendant's interest in the accuracy of the criminal proceeding, the limited financial burden imposed upon the State, and the value of psychiatric assistance in presenting an insanity defense,

84

the Supreme Court found that such expert psychiatric assistance in investigating and presenting an insanity defense clearly constituted such a "basic tool." Id. at 77-83.

The Court emphasized that the entitlement to psychiatric assistance exists only in cases where a defendant's mental condition is "seriously in question" and that the State's obligation did not go beyond providing the defense with the assistance of one competent psychiatric expert. Further, the Court found that the states could provide such assistance as they saw fit and that a defendant's constitutional right did not include the authority "to choose a psychiatrist of his personal liking or to receive funds to hire his own." Id. at 82-83.

In this case, Grayson argues that his due process rights were violated not because of his need for expert psychiatric assistance, but because the trial court failed to award adequate funding to hire an expert pathologist. "Neither the Supreme Court, nor this court, has held that the Constitution requires a state to provide an indigent defendant with nonpsychiatric experts." Baxter v. Thomas, 45 F.3d 1501, 1511 n.24 (11th Cir. 1995) (citing Moore v. Kemp, 809 F.2d 702, 711-12 (11th Cir. 1987) (en banc) and Stephens v. Kemp, 846 F.2d 642, 646 (11th Cir.

1988)).[22]  As this court has done before, however, we will assume, without deciding, that the due process clause "could require the government, both state and federal, to provide nonpsychiatric expert assistance to an indigent defendant upon a sufficient showing of need."  Moore v. Kemp, 809 F.2d 702, 711-12 (11th Cir. 1987) (en banc); see also Stephens v. Kemp, 846 F.2d 642,  646 (11th Cir. 1988).

Even assuming arguendo that Ake applies to nonpsychiatric assistance, we find that Grayson's due process claim lacks merit.  Grayson's trial was not rendered fundamentally unfair by the absence of defense experts in forensic pathology and serology.  This was not a case where the identity of the perpetrator of the crime was in question.  Grayson admitted both before trial and from the stand that he had broken into Mrs. Orr's home, taped the pillow case over her head, and raped her.  Indeed, the forensic evidence developed by the State was largely inconclusive as to Grayson's participation in the crime and it was Grayson's admissions that established the case against him.  Thus, a defense expert to challenge what little forensic evidence was developed that tended to show that Grayson had committed the rapes and the killing, would have been useless in exonerating Grayson.  See Stephens, 846 F.2d at 650 ("In light of the

---

[22] Relying on a Sixth Circuit case, a Fourth Circuit case, and an Alabama case, Grayson contends that "[i]t is now clear that Ake requires a state to provide funds for expert assistance involving any contested, significant factor."  This Court has never so held, and we need not reach that issue today either.

overwhelming evidence that Stephens did not act in self-defense, the expert testimony sought by the defendant would not have affected the outcome of the trial.").

Furthermore, to the extent that forensic evidence may have been helpful in supporting Grayson's theory that he did not intend Mrs. Orr's death, the absence of this evidence in no way rendered the trial fundamentally unfair. Grayson's counsel deftly highlighted the evidence from the autopsy doctor tending to show a lack of intent without the assistance of an expert: the absence of life threatening injuries, the slow death by suffocation, the absence of restraints on Mrs. Orr's hands, and the autopsy doctor's ability to remove the pillowcase without removing the tape. Further, the testimony offered by Dr. Burton in connection with Grayson's state habeas proceedings regarding the forensic evidence was largely cumulative of the findings of the autopsy doctor at trial and failed to add material information helpful to the defense theory of intent. Therefore, Grayson's claim that the denial of sufficient funds to retain forensic experts violated his due process rights also lacks merit.[23]

---

[23] Alternatively, we note that Grayson's trial counsel failed to make the requisite showing in support of his motion for funds that the expert forensic assistance would be significant to the defense theory at trial and merely made conclusory assertions that the expert assistance would be helpful in cross examining the State's experts. See Moore v. Kemp, 809 F.2d 702, 717 (11th Cir. 1987) (en banc) (rejecting Ake claim based upon denial of funds for defense pathology expert where "[a]ll Judge Sosebee knew was that petitioner's lawyer wanted an expert of some kind to

## VI.  CONCLUSION

For all of these reasons, we conclude that the district court did not err in denying Grayson's § 2254 petition.

**AFFIRMED.**

---

review any tests the state crime lab may have performed and to conduct an unspecified number of tests that counsel declined to describe"); Stephens v. Kemp, 846 F.2d 642, 650 (11th Cir. 1988) (rejecting Ake claim for denial of funds to retain ballistics expert where "Judge Pierce was never informed as to what an expert could be expected to contribute to the defense").